UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | |
|---|---|
| CHINA PETROCHEMICAL DEVELOPMENT CORPORATION, Plaintiff, v. PRAXAIR, INC.; ANNE ROBY; JOHN PANIKAR; VERNON THAD EVANS; JOYCE CHEN; YU LING SHIEH; MEI LU; WILLIAM PEARCE; STEVE RIDDICK; JAMES WILLIAM SHAUGHNESSY; TOM SCHULTE; MARK JOSEPH MURRAY; and STEVE ANGEL, Defendants, and PRAXAIR CHEMAX SEMICONDUCTORS MATERIALS COMPANY LIMITED, Nominal Defendant. | Civil Action No. |

## COMPLAINT

Plaintiff China Petrochemical Development Corporation ("CPDC") (a) on behalf of itself, and (b) derivatively on behalf of Praxair Chemax Semiconductors Materials Company Limited (the "JV Company"), hereby brings this action against Defendants Praxair, Inc. ("Praxair"), Anne Roby, John Panikar, Vernon Thad Evans ("Thad Evans"), Joyce Chen, Yu Ling Shieh, Mei Lu, William Pearce, Steve Riddick, James William Shaughnessy, Tom

1

Schulte, Mark Joseph Murray, and Steve Angel (each a "Defendant," and collectively the "Defendants"). Anne Roby, John Panikar, Thad Evans, Joyce Chen, Yu Ling Shieh, Mei Lu, William Pearce, Steve Riddick, James William Shaughnessy, Tom Schulte, and Mark Joseph Murray may each individually be referred to as a "Praxair Appointed JV Company Director/Officer," or collectively as the "Praxair Appointed JV Company Directors/Officers" herein.

## NATURE OF ACTION

1. Praxair approached CPDC, a major local player in Taiwan's industrial chemicals industry, to enter into a joint venture for the distribution of industrial chemicals in Taiwan where CPDC would become a significant but non-controlling shareholder of the joint venture. CPDC agreed to invest in the joint venture in reliance upon Praxair's representations and good faith performance of the parties' proposed joint venture agreement. This was a decision CPDC would regret.

2. The joint venture's operations required significant capital investments. Further, the joint venture's success also depended on familiarity with the Taiwanese market for industrial gases, familiarity with applicable Taiwanese rules and regulations relating to the joint venture's intended businesses, connections with potential customers in Taiwan, and a local joint venture partner's physical facilities. These were all things CPDC could offer as a joint venture partner.

3. CPDC made significant investments in the joint venture. As a minority shareholder, CPDC had negotiated minority shareholder rights (see further below) to which Praxair signed and agreed, and CPDC was entitled to additional rights under applicable corporate laws. As partners, both CPDC and Praxair also agreed to non-competition provisions which would preclude each party from competing against the joint venture. CPDC faithfully performed its obligations under the joint venture agreement and applicable

laws, and CPDC expected and relied upon Praxair, the controlling shareholder, to govern the joint venture in compliance with the joint venture agreement and applicable laws.

4.     Unbeknownst to CPDC, however, Praxair did not intend to treat CPDC fairly as a joint venture partner.    Instead, Praxair, with the active support of the Praxair Appointed JV Company Directors/Officers, took actions to allow Praxair to engage in unauthorized self-dealing transactions, including, among other things siphoning off the JV Company's profits so that Praxair would not have to share these profits with CPDC in proportion to the parties' investments in the JV Company.

5.     First, unbeknownst to CPDC, Praxair purchased large quantities of silane—a chemical with a broad range of industrial applications—from third party suppliers and then resold the very same chemical to the JV Company at prices grossly above the market price for silane.    This was notwithstanding the fact that the JV Company could have purchased silane for itself at market prices.    While the joint venture agreement specifically prohibited this type of self-dealing, related-party transaction without CPDC's authorization, Praxair's sale of silane to the JV Company at inflated prices (a) funneled the JV Company's profits away from the JV Company—and thus away from CPDC—so that Praxair could retain a greater share of any profits stemming from the ultimate sale of silane to third parties, and (b) shifted huge losses away from Praxair and onto the JV Company.

6.     Second, and again unbeknownst to CPDC, Praxair and the Praxair Appointed JV Company Directors/Officers also engaged in unauthorized self-dealing by forcing the JV Company to sell large quantities of silane that the JV Company repackaged to (a) Praxair's own wholly-owned subsidiaries in other jurisdictions within Asia and (b) *even back to Praxair itself*, at substantially below-market prices.    This was notwithstanding the fact that the JV Company could have sold the packaged silane to third parties at substantially higher, market prices.

3

7.     And, third, Praxair and the Praxair Appointed JV Company Directors/Officers rented storage facilities in the United States in order to store *Praxair's own* products. Praxair, improperly putting its own self-interests above the JV Company's, then passed these costs on to the JV Company for no consideration in return whatsoever.

8.     In this way, Praxair and the Praxair Appointed JV Company Directors/Officers both improperly (a) minimized the JV Company's profits so that Praxair would not need to share these profits proportionately with CPDC, (b) maximized Praxair's own profits and the profits of its wholly-owned subsidiaries (all of which ultimately flowed to Praxair itself) by supplying the subsidiaries with a cheap supply of silane that they could in turn resell to third parties for a handsome margin at the expense of the joint venture, and (c) shifted huge losses away from Praxair and its wholly-owned subsidiaries and onto the JV Company.

9.     When CPDC finally began to suspect wrongdoing with respect to the JV Company's silane transactions and requested reasonable investigations, Praxair and the Praxair Appointed JV Company Directors/Officers did not desist from their egregious activities.   Instead, Praxair and the Praxair Appointed JV Company Directors/Officers doubled-down and engaged in wide-ranging conspiracy in an attempt to, (a) conceal their wrongdoing and block lawful investigations by CPDC and its representatives, (b) improperly liquidate the JV Company, and (c) fraudulently transfer the entirety of the JV Company's business to Praxair's affiliates, as follows:

- Praxair and the Praxair Appointed JV Company Directors/Officers forced the JV Company to withhold almost all relevant information and documents relating to the silane transactions from CPDC in order to conceal the their wrongdoing.   This was notwithstanding the fact that CPDC had the express right to the information and documents under the terms of the joint venture agreement.

- Praxair and the Praxair Appointed JV Company Directors/Officers frustrated investigations into the silane transactions conducted by CPDC's nominee as the JV Company's "supervisor" – a corporate individual vested with both the

4

right and the obligation to conduct investigations into suspected corporate wrongdoing under Taiwan law.   This was notwithstanding the fact that CPDC had the express right to nominate the supervisor under the joint venture agreement and Taiwan law explicitly provides that the supervisor was vested with the right—indeed the obligation—to conduct investigations into protracted misconduct of company insiders (e.g., into the silane transactions).

- Praxair and the Praxair Appointed JV Company Directors/Officers unlawfully removed all CPDC's nominees as directors, officers, and supervisors from the JV Company so that CPDC could no longer participate in the JV Company's management, oversee the JV Company's activities, or discover the true nature of Praxair's wrongdoing.   This was notwithstanding the fact that CPDC had the express right to nominate directors, officers, and supervisors to the JV Company under the parties' joint venture agreement.

- Praxair and the Praxair Appointed JV Company Directors/Officers formed a separate subsidiary in Taiwan registered with the competent authorities to engage in the very same business activities as the JV Company, caused the JV Company to withhold any dividend payments to CPDC, caused the JV Company to take out large loans from financial institutions, and attempted to liquidate the JV Company.   Simultaneously, Praxair and the Praxair Appointed JV Company Directors/Officers began to transfer large sums of cash to Praxair's wholly-owned subsidiary in Ireland and attempted to transfer the entirety of the joint venture's business to the separate Taiwanese subsidiary that it had formed.

10.   In short, Praxair and the Praxair Appointed JV Company Directors/Officers engaged in an enormous international conspiracy—spanning three continents—to defraud CPDC and the JV Company out of enormous sums of money.   As detailed below, the Praxair Appointed JV Company Directors/Officers and others each breached their respective fiduciary duties as directors, officers, and supervisors of the JV Company, for their own personal gains, in furtherance of their fraudulent scheme.

11.   Having been essentially blocked from obtaining access to the JV Company's records, CPDC has only recently been able to piece together the true depth of the Defendants' systematic misappropriation, misconduct and related fraudulent concealment.

## THE PARTIES

12. <u>CPDC</u>.   Plaintiff CPDC is a company incorporated in and existing under the laws of Taiwan, with its principal place of business located at 8-11 Floors, Tunghsing Road, Taipei City, Taiwan.   CPDC is a global leading supplier of upstream raw materials for resin, engineering plastics, and synthetic fibers.   CPDC is a public company listed on the Taiwan Stock Exchange and is one of the most reputable, professionally managed companies in Taiwan.   CPDC's board of directors often consists of industry giants and well known civil servants.

13. <u>JV Company</u>.   Nominal Defendant Praxair Chemax Semiconductor Materials Company Limited, *i.e.,* the JV Company, is a company incorporated in and existing under the laws of Taiwan, with its principal place of business located at 6 Floor, No. 145, Shiang Jeng 9th Road, Jubei, Hsinchu, Taiwan.

14.   The JV Company is a joint venture between Praxair and CPDC.   Praxair, the majority shareholder, owns 51% of the JV Company's issued and outstanding shares. CPDC, the minority shareholder, owns 49% of the JV Company's issued and outstanding shares.   Pursuant to the joint venture agreement, Praxair is entitled to nominate 4 out of 7 directors to the JV Company's board while CPDC is entitled to nominate 3 out of 7 directors.

15. <u>Praxair</u>.   Defendant Praxair is a company incorporated in and existing under the laws of Delaware, with its principal place of business located at 10 Riverview Drive, Danbury, Connecticut 06810.   Praxair is an industrial gas company.   Praxair has more than 26,000 employees and has a presence in more than 50 countries.   Praxair is a supplier of industrial gases.   Praxair is a public company listed on the New York Stock Exchange.

16. <u>Anne Roby</u>.   Defendant Anne Roby is a United States citizen and resident of Connecticut.   Roby joined Praxair in 1991 as a development associate.   During her tenure at Praxair, she held a number of management positions in the United States and Asia.   In

2011, Roby served as Praxair Asia's President, responsible for Praxair's industrial gases business in China, India, South Korea, and Thailand as well as the electronics market globally.

17.    Currently, Roby is Praxair's Senior Corporate Vice President—one of Praxair's most senior positions—and is responsible for Praxair's Global Supply Systems, Research & Development, Global Market Development, Global Operations Excellence, Global Procurement, Sustainability, Global Strategic Sales, Electronic Materials and Safety, Health and Environment.    From 2011 until January 9, 2017, Roby simultaneously served as the JV Company's Vice Chairman and was a director on the JV Company's board of directors.

18.    <u>John Panikar</u>.    Defendant John Panikar is a United States citizen and, upon information and belief, a resident of Connecticut.    Panikar joined Praxair in 1991.    During his tenure at Praxair, Panikar has held a number of management positions in the United States and Asia.    Panikar became the Managing Director of Praxair India in 2004.    In 2008, he transferred back to the United States as Vice President of Product Management and Analysis for Praxair's North American Industrial Gases business unit and was appointed Vice President of the U.S. South Region in 2009.

19.    Panikar currently serves as the President of Praxair Asia and is responsible for the growth and profitability of Praxair's industrial gases business in China, India, South Korea, Taiwan, and Thailand.    Panikar has been a director on the JV Company's board of directors since February 21, 2017.

20.    <u>Thad Evans</u>.    Defendant Thad Evans is a United States citizen with extensive ties to Connecticut, currently living in Japan.    Evans joined Praxair in 1983.    Starting in 1997, Evans began working for Praxair Electronics Asia.    Evans served as one of the promoters and initial shareholders of the JV Company before Praxair and CPDC formally

became the JV Company's actual shareholders.

21.  Evans has more than 20 years of experience with the silane business and in dealing with silane suppliers.   He is responsible for managing Praxair's global electronics business and has full knowledge of Praxair's silane business.   Evans has served as a director on the JV Company's board since its incorporation on February 11, 1999 and continues to serve in that capacity as of the filing of this Complaint.   On February 21, 2017, Praxair nominated Evans to serve as the JV Company's Chairman.

22.  Joyce Chen.   Defendant Joyce Chen is President of the JV Company.   Chen first joined the JV Company in 2001 as Vice President.   Chen was nominated by Praxair for, and accepted, the position of President on April 1, 2005.

23.  As the JV Company's President, Chen is fully responsible for managing the JV Company's overall business operations and is fully responsible regarding the JV Company's commercial transactions, including the silane transactions.   Joyce Chen became a director on the JV Company's board of directors in or around 2005 and continues to serve as a director.

24.  Yu Ling Shieh.   Defendant Yu Ling Shieh is currently the JV Company's Business Operations Support Director and is responsible for the company's supply chain management and related duties.   Prior to this position, Shieh served as the Secretary of the JV Company's board of directors in handling ministerial matters.   Since 2013, Shieh has also served as the Secretary of the JV Company.   Shieh is familiar with the JV Company's procurement of silane internationally.

25.  Mei Lu.   Defendant Mei Lu joined the JV Company on March 1, 2010 as the company's Finance Manager in its Finance & Accounting Department.   She is currently the JV Company's Finance Director and is knowledgeable on all the JV Company's financial arrangements.

26.  William Pearce.   Defendant William Pearce is a Vice President at Praxair.

Pearce served as a director on the JV Company's board of directors starting from 2013 to January 9, 2017. Upon information and belief, Pearce is a citizen of Connecticut.

27. <u>Steve Riddick</u>. Defendant Steve Riddick served as a director on the JV Company's board of directors from 2013 to January 9, 2017. From 2010 to 2016, Riddick served in a number of legal roles at Praxair, including Senior Corporate Counsel of Praxair, Vice President and General Counsel of Praxair Asia, and Associate General Counsel of Praxair. He is currently General Counsel at Tenable Network Security. Upon information and belief, Riddick is a citizen of Connecticut.

28. <u>James William Shaughnessy</u>. Defendant James William Shaughnessy has served as a director on the JV Company's board of directors since February 21, 2017. Shaughnessy held a number of legal positions at Praxair from 2004 to the present, including Assistant General Counsel at Praxair and General Counsel of Praxair Asia. Upon information and belief, Shaughnessy is a citizen of Connecticut.

29. <u>Tom Schulte</u>. Defendant Tom Schulte served as a director on the JV Company's board of directors starting from 2011 to 2013. Upon information and belief, Schulte is a citizen of Connecticut.

30. <u>Mark Joseph Murphy</u>. Defendant Mark Joseph Murphy served as a director on the JV Company's board of directors from 2008 to 2011. Upon information and belief, Murphy is a citizen of Connecticut.

31. Steve Angel. Defendant Steve Angel is a citizen of Connecticut. Angel was appointed President & CEO of Praxair in January 2007, and Chairman in April 2007. Angel joined Praxair in 2001 as an Executive Vice President and was named President and Chief Operating Officer in February 2006. Angel was appointed President, Chief Operating Officer and Chairman of Praxair in 2007. Angel has served on Praxair's board of directors since 2006.

32.  Doe Defendants 1 - 20.    Upon information and belief, Doe Defendants 1 – 20 (each a "Doe Defendant," collectively the "Doe Defendants"), the identities of whom will be determined during the course of this action, engaged in the events and omissions giving rise to the claims described in this Complaint.

## JURISDICTION AND VENUE

### A.  Subject Matter Jurisdiction

33.  This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 because there is a civil action arising under the laws of the United States.    CPDC asserts claims pursuant to the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1960-1968 ("RICO"), specifically 18 U.S.C. § 1964(c) and (d).    Pursuant to 28 U.S.C. § 1367, this Court may exercise supplemental jurisdiction over the state law claims.

### B.  Personal Jurisdiction

34.  This Court has personal jurisdiction over Defendants Praxair, Anne Roby, John Panikar, William Pearce, Steve Riddick, James William Shaughnessy, Tom Schulte, Mark Joseph Murphy, and Steve Angel.    These Defendants are citizens of the State of Connecticut.

35.  Further, this Court has personal jurisdiction over all Defendants under General Statutes §§ 52-59b because—as detailed throughout this Complaint—Defendants engaged in tortious acts within and centered in the State of Connecticut, and jurisdiction in this state comports with notions of fair play and substantial justice under the Constitution of the United States.

### C.  Venue

36.  Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and (c).    As discussed, many of the Defendants are residents of the State of Connecticut wherein this judicial district is located.    Many of the Defendants reside in this judicial district. Further, a substantial part of the events or omissions giving rise to this action occurred in this

judicial district.

## STATEMENT OF FACTS

**I.  Praxair Induces CPDC To Enter Into The JV Agreement**

37.  During the late 1990s, Taiwan's semiconductor industry was on the upswing. Praxair wanted to take advantage of the market opportunity to sell industrial gases to Taiwanese companies engaged in the semiconductor business.   To this end, it searched for a strategic and investment partner in Taiwan to form a joint venture.

38.  Thus, Praxair discussed the possibility of entering into a joint venture to form a joint venture company with CPDC, a major player in the industrial chemicals industry in Taiwan.   Praxair insisted on being a controlling shareholder, which meant that it would have majority ownership of the JV Company with day-to-day control of the operations of the JV Company.

39.  While CPDC was willing to be a minority investor, CPDC was concerned about the possibility that the joint venture's majority shareholder could abuse its control over the joint venture's day-to-day operations and eventually push CPDC out if and once the business venture proved to be profitable.   This would be harmful to CPDC's investment in the joint venture as well as its reputation with its shareholders and other business associates. Praxair assured CPDC that this would not be the case and offered CPDC the following, and other, safeguards:

- All related-party transactions and agreements between Praxair and the joint venture company would require the approval of *both* Praxair and CPDC.   In this way, Praxair could not unilaterally enter into agreements with the JV Company that would be beneficial to Praxair but harmful to the joint venture company (and thus harmful to CPDC's investment in the JV Company).

- Praxair would operate the joint venture in a lawful manner.   Any directors and officers appointed to the joint venture company would be required to operate it in a manner that was consistent with his or her fiduciary duties to the company.

11

- CPDC would be able to appoint three—out of a total of seven—directors to the joint venture company. CPDC would also be able to appoint the joint venture's Chairman and Executive Vice President. In this way, CPDC could oversee the joint venture's operations and participate in its management.

- CPDC would be entitled to appoint a supervisor to the joint venture company. Under Taiwan law, a corporate "supervisor" is an individual vested with both the right and the obligation to conduct investigations in regards to a company's affairs. A supervisor has broad powers to conduct investigations. For obvious reasons, this provided CPDC with another essential supervisory function.

- Praxair could not amend the joint venture company's charter documents without CPDC's consent.

- The joint venture was required to pay out at least 50% of its profits proportionately to Praxair and CPDC on an annual basis. In this way, Praxair could not cause the joint venture company—which Praxair would control—to hoard cash for the benefit of Praxair, excluding CPDC from the joint venture's profits after CPDC made a substantial investment.

- CPDC would be entitled to examine the joint venture company's financial records at any time. In this way, CPDC could confirm that the joint venture was being operated fairly, consistent with the parties' agreement.

- Praxair could not compete with the joint venture directly, or set up a separate subsidiary in Taiwan to compete with the joint venture indirectly. In this way, Praxair could not profit from a separate business in Taiwan to the detriment of the joint venture (which it also controlled and the profits of which it was required to share with CPDC).

40. The safeguards Praxair offered to CPDC described in paragraph 39 may collectively be referred to herein as the "Minority Shareholder Safeguards."

41. Reassured by the Minority Shareholder Safeguards, CPDC agreed to enter into a joint venture agreement (the "JV Agreement") with Praxair on or around November 19, 1998 that incorporated the above-referenced Minority Shareholder Safeguards to CPDC. The parties then incorporated, and invested into, the JV Company on or around February 11, 1999 pursuant to the terms of the JV Agreement. The JV Company has been operational

from its creation in February 1999 to the present date.

42.  Under the JV Agreement, Praxair became the JV Company's majority shareholder and owns 51% of the JV Company's shares.   Praxair also appointed the JV Company's President, who was charged with managing the JV Company's day-to-day activities.

43.  CPDC became the JV Company's minority shareholder and owns 49% of the JV Company's shares.   While Praxair manages the day-to-day operations of the JV Company, CPDC is entitled to participate in the JV Company's management through its nominees as the JV Company's Chairman and Executive Vice President pursuant to the JV Agreement.

## II.  The Conflicted Silane Transactions

44.  Unbeknownst to CPDC, however, Praxair did not intend to comply with the JV Agreement or to operate the JV Company fairly.   As detailed below, Praxair had no intention of being bound by the Minority Shareholder Safeguards.   Further, Praxair intended to disproportionately profit from the JV Company's business and to shift its own potential losses onto the JV Company notwithstanding CPDC's substantial capital investment in the JV Company and CPDC's contributions to the JV Company through its physical facilities, familiarity with the local Taiwan industrial chemical market, and connections to potential customers and others in Taiwan.

### A.  The JV Company's Silane Business.

45.  A major part of the JV Company's business was and continues to be to purchase silane ("Unpackaged Silane") from suppliers, use the JV Company's facilities and workers to package the Unpackaged Silane ("Packaged Silane"), and then resell the Packaged Silane at a markup to third parties resulting in a profit to the JV Company.

46.  Upon information and belief, approximately 58% of the JV Company's revenues stem from its sale of Packaged Silane.

47. At the outset, Praxair—which managed the JV Company's day-to-day operations—misappropriated profits from the JV Company in at least two ways.

**B. The Conflicted Unpackaged Silane Transactions.**

48. First, Praxair, in concert with the Praxair Appointed JV Company Directors/Officers, (a) purchased Unpackaged Silane from third party suppliers of Unpackaged Silane and then (b) engaged in unauthorized, self-dealing transactions whereby Praxair resold the Unpackaged Silane to the JV Company at prices grossly above the market price for silane (collectively, the "Conflicted Unpackaged Silane Transactions").

49. At no time did CPDC ever authorize any of the Conflicted Unpackaged Silane Transactions even though CPDC's authorization was required under the JV Agreement's Minority Shareholder Safeguards, which Praxair had promised CPDC.

50. For example, upon information belief, from 2008 to the present, Praxair has sold Unpackaged Silane to the JV Company at prices ranging from approximately $65 to $75 per kilogram when the market price of Unpackaged Silane during the same period was at times lower than $10 per kilogram. In this way, Praxair has sold millions of kilograms of Unpackaged Silane to the JV Company over the past several years.

51. Moreover, Praxair and the Praxair Appointed JV Company Directors/Officers hid the Conflicted Unpackaged Silane Transactions from CPDC for years and, when finally asked for information on these transactions, repeatedly refused to provide any.

**C. The Conflicted Packaged Silane Transactions.**

52. Second, Praxair, in concert with the Praxair Appointed JV Company Directors/Officers, engaged in unauthorized, self-dealing transactions by causing the JV Company to resell Packaged Silane to (a) Praxair's wholly-owned subsidiaries, and (b) even back to Praxair itself, at substantially below-market prices (collectively, the "Conflicted Packaged Silane Transactions").

53. For example, during 2008, Praxair forced the JV Company to sell Packaged

Silane to itself and its wholly-owned subsidiaries for an average price of $90.07 per kilogram when the market price of the very same Packaged Silane was at least $123.71 per kilogram – a substantial markdown of more than 27%.

54. The (a) Conflicted Unpackaged Silane Transactions and (b) the Conflicted Packaged Silane Transactions may collectively be referred to herein as the "Conflicted Silane Transactions."

55. Like the Conflicted Unpackaged Silane Transactions, Praxair and the Praxair Appointed JV Company Directors/Officers concealed the Conflicted Packaged Silane Transactions from CPDC.

**D. Praxair's Motive For The Conflicted Silane Transactions.**

56. Praxair's motive for the Conflicted Silane Transactions was simple but egregious. Praxair only owns 51% of the JV Company's shares and only 51% of the JV Company's profits should ultimately flow to Praxair. Forty nine percent of the JV Company's profits are supposed to flow to CPDC. On the other hand, 100% of the profits earned by Praxair and its wholly-owned subsidiaries belong to Praxair.

57. So instead of abiding by the provisions of the JV Agreement, including the Minority Shareholder Safeguards, Praxair and the Praxair Appointed JV Company Directors/Officers chose to maximize Praxair's own profits and the profits of its wholly-owned subsidiaries at the expense of the JV Company, and thus at the expense of CPDC, by engaging in the Conflicted Silane Transactions.

58. Simply put, Praxair, with the active assistance of the Praxair Appointed JV Company Directors/Officers, over many years, forced the JV Company to enter into the Conflicted Silane Transactions in order to line its own pockets and reduce its losses, to the detriment of its purported joint venture partner, CPDC.

59. In addition, and as discussed further below, CPDC repeatedly requested that the JV Company provide it with information and documents regarding the Conflicted Silane

Transactions for years. But instead of causing the JV Company to provide CPDC with such information and documents, Praxair and the Praxair Appointed JV Company Directors/Officers actively concealed the information and documents from CPDC for years.

### E. Defendants Conceal the Conflicted Silane Transactions.
**Praxair enters into a forward agreement with a supplier to purchase silane.**

60. In or around August 2008, Praxair entered into a long-term supply agreement (the "REC-Praxair Supply Agreement") with REC Advanced Silicon Materials LLC ("REC"), a Delaware limited liability company, and a major supplier of Unpackaged Silane. Under the REC-Praxair Supply Agreement, Praxair committed to purchase a minimum of approximately 3,767 metric tons (3.767 million kilograms) of Unpackaged Silane from REC at an agreed-upon base price (subject to modest upward adjustments based on a prescribed formula) over several years (the "Forward Silane Price").

61. In this way, if the market price of silane generally increased, Praxair could continue to purchase Unpackaged Silane at the lower Forward Silane Price, package the Unpackaged Silane into Packaged Silane, and then resell the Packaged Silane at a higher market price, reaping a handsome profit.

62. But almost immediately after Praxair entered into the REC-Praxair Supply Agreement, the market price of silane did not skyrocket; instead, it imploded, in part due to the 2008 financial crisis.

63. Thus, Praxair was left with a huge commitment to purchase large quantities of Unpackaged Silane under the REC-Praxair Supply Agreement at the Forward Silane Price, which after the implosion in silane prices was much higher than the market price of Unpackaged Silane. Obviously, this would decrease Praxair's margins realized on any subsequent re-sales of Packaged Silane to third parties since Praxair had a much greater cost of goods sold for Unpackaged Silane compared to others not bound by agreements similar to the REC-Praxair Supply Agreement.

16

64.  Had Praxair not entered into the REC-Praxair Supply Agreement, Praxair would have been free to purchase Unpackaged Silane on the market at market prices, which, following the plummet in the market price of silane, was much lower than the Forward Silane Price.   In this way, while the market price of Packaged Silane had dropped, Praxair would also have benefited from the lower market prices in Unpackaged Silane and turn a greater profit on the ultimate sale of Packaged Silane to third parties.

**Praxair dumps its losses under the REC-Praxair Supply Agreement onto the JV Company.**

65.  Instead of simply absorbing the losses on its commitment to purchase large quantities of Unpackaged Silane under the REC-Praxair Supply Agreement, however— unbeknownst to CPDC—Praxair and the Praxair Appointed JV Company Directors/Officers concocted a plan to dump the lion's share (at least 70%) of the Unpackaged Silane Praxair was obligated to purchase from REC onto the JV Company at the same or greater price that Praxair had committed to purchase Unpackaged Silane from REC for.   Specifically, first, Praxair continued to purchase Unpackaged Silane from REC under the REC-Praxair Supply Agreement at the Forward Silane Price (in order to avoid being in default of the agreement and facing a lawsuit brought against Praxair by REC).   Then, Praxair sold the bulk of the Unpackaged Silane it had purchased from REC to the JV Company for at least the Forward Silane Price.   Obviously, this was detrimental to the JV Company's margins on any subsequent re-sales of Packaged Silane to third parties.

66.  Had Praxair not done this, the JV Company could have purchased Unpackaged Silane on the open market for much lower prices—prices that reflected the decrease in silane prices following the financial crisis—and then resold Packaged Silane to third parties for a much higher profit margin.

67.  Further, when Praxair incurred any interest, penalties, or ancillary costs under the REC-Praxair Supply Agreement stemming from the lack of demand for Unpackaged

Silane, it simply charged these penalties to the JV Company *without providing the JV Company any value whatsoever in exchange*.

68.     Thus, in this way, Praxair shifted the bulk of its own losses stemming from the decrease in silane prices onto the JV Company thereby forcing CPDC to share in much of Praxair's losses under the REC-Praxair Supply Agreement, which the JV Company was not even a party to.    In fact, after such losses began to mount, the Praxair Appointed JV Company Directors/Officers even deliberately tried to mislead CPDC into thinking that the JV Company committed to purchase Unpackaged Silane from REC.    Finally, while Praxair was unwilling to breach the REC-Praxair Supply Agreement with REC, Praxair was perfectly willing to breach its JV Agreement with CPDC, presumably because Praxair had already secretly siphoned off huge profits and freed itself of tremendous losses, and breaching the JV Agreement was necessary to continue its cover up of the same.

**The market for silane remains sluggish.**

69.     As discussed, the demand for, and the market price of, silane imploded in 2008 following the financial crisis.    The market price of silane remained weak.    For several years following 2008, the price of silane declined by approximately $10 per kilogram per year.    And, in 2012, the price of silane declined dramatically by $32 per kilogram in that one year alone.    Provided that Praxair had been dumping the bulk of its losses under the REC-Praxair Supply Agreement onto the JV Company for several years by forcing the JV Company to purchase overpriced Unpackaged Silane, substantially increasing the JV Company's costs, Praxair projected that it could not continue to operate the JV Company at a profit.    Anticipating that the JV Company would incur a loss—potentially for years to come—Praxair feared that CPDC would start asking questions and eventually uncover the Conflicted Silane Transactions.

**Praxair concocts a story to justify dumping its losses under the REC-Praxair Supply Agreement onto the JV Company.**

18

70.    Wishing to avoid potential financial and criminal liability and to continue to minimize its losses stemming from the REC-Praxair Supply Agreement, Praxair decided to act preemptively.    As detailed below, Praxair and the Praxair Appointed JV Company Directors/Officers concocted a fraudulent scheme to justify shifting much of Praxair's losses onto the JV Company and thus onto CPDC.

71.    During a meeting with CPDC, Praxair's nominee as the JV Company's President, Defendant Joyce Chen, informed CPDC that (a) Praxair and the JV Company had actually entered into an agreement on "back-to-back" terms with the REC-Praxair Supply Agreement for (b) Praxair to sell the vast majority of the Unpackaged Silane that it was obligated to purchase from REC to the JV Company (the "Purported Praxair-JV Company Supply Agreement").    Chen also told CPDC that Praxair and the JV Company had "agreed" that the sales price for Unpackaged Silane under the Purported Praxair-JV Company Supply Agreement would also be the Forward Silane Price. (It was not until early 2017 that CPDC finally learned that the Purported Praxair-JV Company Supply Agreement did not even exist. This was notwithstanding the fact that CPDC had requested to see a copy of the "agreement" on multiple prior occasions.)

72.    Joyce Chen further informed CPDC that (a) the market price of silane had imploded; and (b) since Praxair and the JV Company had concluded the Purported Praxair-JV Company Supply Agreement, the JV Company was obligated to purchase the vast majority of Praxair's Unpackaged Silane under the REC-Praxair Supply Agreement from Praxair at the Forward Silane Price that was (after the implosion in silane prices) much higher than the market price of Unpackaged Silane; thus (c) as a result, Praxair and the JV Company projected that the JV Company would suffer substantial losses.

73.    And, on the spot and at the very same meeting, Joyce Chen then demanded that CPDC retroactively ratify any and all losses (whether realized or projected) stemming

from the Purported Praxair-JV Company Supply Agreement. Such coercion, if successful, could have led to Praxair being absolved of some or all of its surreptitious siphoning off of profits from, and shifting of losses onto, the JV Company.

74. CPDC refused and requested a reasonable investigation into the silane transactions.

### III. Defendants Engage In A Massive Conspiracy To Cover Up The Conflicted Silane Transactions.

75. When CPDC requested reasonable investigations into the silane transactions after its meeting with Joyce Chen, Praxair did not desist from its egregious activities and cooperate with reasonable investigations. Instead, Praxair and the Praxair Appointed JV Company Directors/Officers engaged in a massive conspiracy to cover up their egregious activities.

76. First, Praxair and the Praxair Appointed JV Company Directors/Officers forced the JV Company to conceal almost all relevant information and documents relating to the silane transactions from CPDC. Praxair and the Praxair Appointed JV Company Directors/Officers also forced the JV Company to frustrate any meaningful investigations into the Conflicted Unpackaged Silane Transactions conducted by CPDC's nominee as the JV Company's supervisor, Janson Yu. In this way, Defendants attempted to avoid criminal and financial liability for the Conflicted Silane Transactions.

77. Second, failing to address CPDC's concerns relating to the Conflicted Unpackaged Silane Transactions, Praxair and the Praxair Appointed JV Company Directors/Officers manufactured a purported breach of the JV Agreement by CPDC as a pretext to terminate the JV Agreement and remove all CPDC's nominees as directors, officers, and supervisors from the JV Company so that Praxair could unilaterally operate the JV Company with impunity, without any participation or oversight from CPDC.

78. Finally, realizing CPDC would contest Defendants' actions to conceal the

20

Conflicted Silane Transactions and remove CPDC's nominees to the JV Company, Defendants attempted to, and continue to attempt to, scuttle the JV Company so that CPDC and relevant law enforcement officials will be unable to ever investigate the full extent of Defendants' wrongdoing. Along these lines, Praxair and the Praxair Appointed JV Company Directors/Officers:

- Secretly formed a separate Praxair subsidiary in Taiwan ("Praxair Taiwan"), registered to engage in the same business activities as the JV Company in anticipation of the JV Company's dissolution upon which Praxair and the Praxair Appointed JV Company Directors/Officers would transfer the *entirety* (not just Praxair's proportionate share) of the JV Company's business to Praxair Taiwan.

- Secretly forced the JV Company to borrow millions in unnecessary loans from numerous financial institutions (at market interest rates) and then fraudulently transferred substantial amounts of cash out of the JV Company to Praxair's wholly-owned subsidiary in Ireland ("Praxair Ireland") in the form of related-party loans – loans that were virtually interest free.

- Forced the JV Company to withhold any dividend payments to CPDC for several years in order to stockpile cash—several million of dollars—at the JV Company and transfer the cash to Praxair's affiliates.

79. In this way, Praxair and the Praxair Appointed JV Company Directors/Officers attempted to transfer the bulk of the JV Company's assets out of the JV Company to Praxair's affiliates, liquidate the JV Company, and leave CPDC with an equity interest in an empty shell—the JV Company—stripped of the bulk of its assets.

80. All this is notwithstanding the fact that all of Praxair and the Praxair Appointed JV Company Directors/Officers actions were in direct conflict with the Minority Shareholder Safeguards that Praxair had promised CPDC in order to induce CPDC to enter into the JV Agreement and invest in the JV Company.

**A. Defendants Obstruct CPDC's Requests to Examine Records Relating to the Silane Transactions and Conduct Reasonable Investigations.**

**Praxair and the Praxair Appointed JV Company Directors/Officers deny**

**CPDC's requests to examine records.**

81.   Following CPDC's meeting with Joyce Chen, CPDC has repeatedly requested that the JV Company provide it with information and documents relating to the JV Company and its purchases of silane.   And, CPDC has repeatedly requested to conduct an investigation into the silane transactions.   Praxair and the Praxair Appointed JV Company Directors/Officers have repeatedly forced the JV Company to deny CPDC with access to such information and documents and have repeatedly precluded CPDC's request to conduct a proper investigation into the silane transactions.

82.   For example, Janson Yu, CPDC's nominee as supervisor to the JV Company, sent a letter to the JV Company's board of directors requesting information and documents relating to the silane transactions.   At Praxair and the Praxair Appointed JV Company Directors/Officers instructions, however, the JV Company provided Yu with very few materials and withheld other directly relevant information.   Ching-Jing Sheen, Ko Ming Lin, and Edward Wang – CPDC's nominees to the JV Company's board – followed-up on Yu's requests with a subsequent letter six weeks later.   The letter was ignored.

83.   CPDC has repeatedly sent e-mails to the JV Company requesting clarifications in regards to the JV Company's monthly-unaudited financial statements but the JV Company, at Praxair and the Praxair Appointed JV Company Directors/Officers' direction, refused to respond to the vast majority of CPDC's inquiries.

84.   For example:

- In an e-mail dated March 9, 2016, CPDC requested that the JV Company provide it with, among other things, information relating to the JV Company's decrease in January 2016 revenues.   At Praxair and the Praxair Appointed JV Company Directors/Officers' direction, the JV Company ignored CPDC's e-mail.

- In an e-mail dated December 25, 2016, CPDC e-mailed the JV Company to inquire about, among other things, the JV Company's increase in revenues during November 2016.   At Praxair and the Praxair Appointed JV Company

Directors/Officers' direction, the JV Company ignored CPDC's e-mail.

- In an e-mail dated January 19, 2017, CPDC e-mailed the JV Company to inquire about, among other things, the JV Company's sales volume. At Praxair and the Praxair Appointed JV Company Directors/Officers' direction, the JV Company ignored CPDC's e-mail.

85. Indeed, Praxair and the Praxair Appointed JV Company Directors/Officers even forced the JV Company to withhold the JV Company's audited financial statements from CPDC for several years notwithstanding the fact that under Taiwan law, a company is required to provide its shareholders with audited financial statements on an annual basis. (In other words, not only was CPDC entitled to the audited financial statements under the terms of the JV Agreement; further, as a shareholder of the JV Company, CPDC had an independent legal right under Taiwan corporations law to the JV Company's audited financial statements even absent the JV Agreement.)

86. It was only after much direct judicial intervention in Taiwan that Praxair and the Praxair Appointed JV Company Directors/Officers finally allowed the JV Company to release its audited financial statements for fiscal years 2012 to 2015 to CPDC (but nothing more) in 2017. And, as of the filing of this Complaint, CPDC has yet to receive the JV Company's audited financial statements for fiscal year 2016. Of importance, CDPC learned that the audited financial statements were riddled with qualifications relating to the silane transactions from the JV Company's auditor, PricewaterhouseCoopers.

**Defendants obstruct CPDC's reasonable investigations into the silane transactions.**

87. After CPDC's repeated requests to investigate the silane transactions and knowing that it lacked any legal or contractual basis to oppose Yu's investigation, Praxair and the Praxair Appointed JV Company Directors/Officers seemed to finally agree to allow Yu to investigate the silane transactions.

88. Pursuant to his rights under Taiwan law, Yu contracted the accounting firm of

KPMG to conduct an agreed-upon procedures audit of the silane transactions. Having access to, and the review of, applicable information and documents relating to the silane transactions, however, was crucial to the agreed-upon procedures engagement. As such, KPMG provided Yu with an itemized list of information and documents that it needed to perform the agreed-upon procedures engagement. Yu incorporated KPMG's itemized list into another letter he wrote to the JV Company's board.

89. Rather than providing Yu with the information and documents that he had requested, the JV Company, at Praxair and the Praxair Appointed JV Company Directors/Officers' instruction, refused to provide Yu with even a single document described in Yu's itemized list.

90. For example:

- Yu requested that the JV Company provide him with "Copies of all transaction agreements with REC or Praxair Inc. with respect to the supply of Silane, which [the JV Company] is a party." At Praxair and the Praxair Appointed JV Company Directors/Officers' direction, the JV Company did not provide Yu with any such information or documents.

- Yu requested that the JV Company provide him with "Copies of all Silane purchase orders issued by the JV Company, whether to REC or Praxair Inc." At Praxair and the Praxair Appointed JV Company Directors/Officers' direction, the JV Company did not provide Yu with any such information or documents.

- Yu requested that the JV Company provide him with "Copies of all bill[s] of lading regarding each [shipment] of Silane from either REC or Praxair Inc." At Praxair and the Praxair Appointed JV Company Directors/Officers' direction, the JV Company did not provide Yu with any such information or documents.

91. As shown in Yu's letter itself, all the information and documents Yu requested were reasonably related to the silane transactions; they were not meant to harass Praxair or the JV Company. Yet, at Praxair and the Praxair Appointed JV Company Directors/Officers' direction, the JV Company refused to provide Yu with any documents whatsoever.

92.   Unable to access any pertinent documents, KPMG proposed that it carry out its agreed upon procedures engagement by interviewing the JV Company's employees.   In this way, at least KPMG could potentially obtain some information on behalf of Yu rather than no information at all.   At Praxair and the Praxair Appointed JV Company Directors/Officers' direction, the JV Company reluctantly agreed to a one day interview.

93.   During the interview, KPMG interviewed a few employees from the JV Company who answered some of KPMG's questions.   But when KPMG requested evidence to support the JV Company's employees' responses to KPMG's questions, at Praxair and the Praxair Appointed JV Company Directors/Officers' direction, the JV Company only allowed KPMG to review a very limited sample of documents.   And when KPMG requested photocopies of the already limited sample of documents, the JV Company only permitted KPMG to photocopy a few items.

94.   KPMG's attempt to conduct a proper agreed-upon procedures audit in regards to the silane transactions was severely obstructed by Praxair and the Praxair Appointed JV Company Directors/Officers.   While KPMG estimates that it probably should have had access to thousands of documents, the JV Company, at Praxair and the Praxair Appointed JV Company Directors/Officers' direction, only provided KPMG with a total of 66 pages of documents.   Unsurprisingly, the KPMG report contains numerous qualifications as to KPMG's ability to properly audit the Conflicted Silane Transactions.

95.   All this is notwithstanding the fact that Praxair and the Praxair Appointed JV Company Directors/Officers' obstruction of CPDC's requests for information and documents from the JV Company and requests to properly investigate the silane transactions were in clear breach of the Minority Shareholder Safeguards Praxair had promised CPDC in order to induce CPDC to invest in the JV Company.

**Defendants have even obstructed an investigation into the silane transactions ordered by a Taiwan court.**

25

96. After an extended period of Praxair and the Praxair Appointed JV Company Directors/Officers' obstruction of CPDC's efforts to (a) obtain information and documents relating to the silane transactions, and (b) conduct meaningful investigations into the Conflicted Silane Transactions, CPDC petitioned a Taiwanese court to appoint a public inspector to investigate the Conflicted Silane Transactions under Article 245 of Taiwan's Company Act. Under Taiwan law, a "public inspector" is a court mandated inspector appointed to conduct inspections into the "business operations, the financial accounts and the property" of a company.

97. Praxair and the Praxair Appointed JV Company Directors/Officers forced the JV Company to oppose CPDC's petition notwithstanding the Minority Shareholder Safeguards.

98. Despite Praxair and the Praxair Appointed JV Company Directors/Officers' obstruction, however, on April 24, 2017, the Taiwanese court approved CPDC's petition and appointed a public inspector—Ms. Yi Tung Lee, a certified public accountant—to investigate the Conflicted Silane Transactions.

99. But Praxair and the Praxair Appointed JV Company Directors/Officers continued to obstruct any meaningful investigations into the Conflicted Silane Transactions.

100. For example, Lee informed the JV Company that she would be visiting the JV Company to conduct investigations on August 1, 2017. At the direction of Praxair and the Praxair Appointed JV Company Directors/Officers, however, the JV Company demanded that Lee—a court mandated neutral inspector—*execute a non-disclosure agreement relating to any findings she uncovered during the course of her planned inspection*, which would totally eviscerate the whole purpose of Lee's investigations.

101. After much intimidation from the JV Company at the direction of Praxair and the Praxair Appointed JV Company Directors/Officers, Lee has attempted to resign as the JV

Company's public inspector.    The Taiwan court has thus far refused her resignation.

**B.  Defendants Manufacture CPDC's Purported Breach of the JV Agreement.**

102. After Praxair and the Praxair Appointed JV Company Directors/Officers directed the JV Company to frustrate KPMG's audit of the silane transactions, CPDC demanded further investigations.    Instead of cooperating as it was required to under the Minority Shareholder Safeguards, however, Praxair, in concert with the Praxair Appointed JV Company Directors/Officers, manufactured CPDC's purported breach of the JV Agreement as a pretext to terminate the JV Agreement and remove all CPDC's nominees as directors, officers, and supervisors to the JV Company.    In this way, Praxair attempted to unilaterally operate the JV Company with impunity in total disregard of CPDC's right to manage and oversee the JV Company.

103. As further described below, during a JV Company board meeting, CPDC's previous nominee as the JV Company's Chairman, Tony Sheen, wanted to replace himself with his colleague, Ko Ming Lin.    As CPDC's new nominee as the JV Company's Chairman, Lin requested further investigations into the silane transactions during the same board meeting.    Defendants Anne Roby and John Panikar refused to agree to further investigations.

104. The JV Agreement provides that both Praxair and CPDC "shall use, upon mutual consultation, the reasonable efforts to assist [the JV Company] to borrow from reputable financial institutions such funds as may be *necessary* for the commencement and operation of [the JV Company's] business on the best possible terms and conditions" (emphasis added).    Banks in Taiwan customarily require a borrower's chairman to execute financing agreements for loans by affixing the company's seal to the agreement.

105. At the same board meeting, Anne Roby and John Panikar demanded that Lin immediately execute a credit facility between the JV Company and a Taiwanese bank, CTBC Financial Holdings (the "CTBC Credit Facility") at the meeting.    Lin did not refuse to

execute the CTBC Credit Facility. Instead, Lin simply said that he would examine the JV Company's cash flow situation in order to evaluate whether the CTBC Credit Facility should be approved.

106. Using Lin's refusal to execute the credit facility on the spot as a pretext, one week later, Roby wrote a letter to CPDC requesting CPDC to immediately cure its purported breach of the JV Agreement, presumably by executing the CTBC Credit Facility by affixing the JV Company's corporate seal on the loan documents.

107. To responsibly carry out its obligations to assist the JV Company obtain loans under the terms of the JV Agreement, CPDC was thus required to: (a) determine whether the CTBC Credit Facility was "necessary" to the JV Company's operations by examining its cash flows and (b) obtain the JV Company's corporate seal and affix the seal to the CTBC Credit Facility documents (if the CTBC Credit Facility was indeed necessary).

108. Praxair and the Praxair Appointed JV Company Directors/Officers, however, refused to permit Lin to examine the JV Company's cash flow situation.

109. Praxair and the Praxair Appointed JV Company Directors/Officers further refused to provide Lin with the JV Company's corporate seal. For example, Lin wrote Joyce Chen and Yu Ling Shieh a letter to request the corporate seal. But instead of providing Lin with the JV Company's corporate seal, upon information and belief, Chen, Shieh, and Roby baked up a strategy to manufacture CPDC's purported termination of the JV Agreement.

110. Two days after Joyce Chen and Yu Ling Shieh received Lin's letter, Roby sent Lin a letter responding on behalf of Chen and Shieh. In the letter, Roby ignored prior meeting minutes and fraudulently alleged that CPDC did not properly replace its nominee as the JV Company's chairman with Lin. Instead, Roby alleged that Tony Sheen had somehow simply resigned from his position as the JV Company's chairman. Thus, Roby asserted, the Chairman position was simply vacant and neither Sheen nor Lin were the JV Company's

Chairman. Based on this, Roby alleged that given Lin was not the JV Company's Chairman, he was not entitled to the JV Company's corporate seal, rebuking Lin for even asking. Roby then wrote that since the JV Company's Chairman position was vacant, Roby, who was the company's Vice Chairman, would serve as the JV Company's acting Chairman and carry out all the Chairman's duties indefinitely.

111. In other words, on the one hand, Praxair and Roby alleged that CPDC was in breach of the JV Agreement because its nominee as the JV Company's Chairman refused to execute the CTBC Credit Facility. On the other hand, Praxair and Roby (a) refused to recognize either Sheen or Lin as the JV Company's Chairman (proclaiming Roby to be the *de facto* Chairman); (b) refused to provide Lin with the JV Company's corporate seal so that he could execute the CTBC Credit Facility if it was necessary for the JV Company's operations; and (c) refused to permit Lin to examine the JV Company's cash flows to determine whether the CTBC Credit Facility was necessary, so that CPDC would not even have a chance to cure its purported "breach" of the JV Agreement. (Indeed, if anything, taking Praxair's position that Roby was the JV Company's *de facto* Chairman and the CTBC Credit Facility was necessary, Praxair, not CPDC, had breached the JV Agreement.)

112. In this way, Defendants absurdly alleged that the JV Agreement was terminated so that Praxair would no longer be bound by the JV Agreement.

## C. Praxair and the Praxair Appointed JV Company Directors/Officers Remove All CPDC's Nominees as Directors, Officers, and Supervisors of the JV Company.

113. Taking the untenable position that the JV Agreement was terminated (it was not), Praxair used the position as cover to remove all CPDC's nominees as directors, officers, and supervisors of the JV Company, replacing all these positions with its own nominees. In this way, Praxair and the Praxair Appointed JV Company Directors/Officers operated the JV Company with impunity—bereft of any oversight from CPDC—in an attempt to further sanitize themselves of potential criminal and financial liability arising from the Conflicted

Silane Transactions. This is a clear cut example of Praxair's motive to cover up its prior misconduct, which was all the more egregious because there had been no history of CDPC blocking or unduly hindering the day-to-day operations of the JV Company. Indeed, CPDC had been faithfully complying with the JV Agreement.

**Defendants remove CPDC's nominee as the JV Company's Chairman.**

114. As has been briefly described, during a JV Company board meeting, Tony Sheen, CPDC's previous nominee as the JV Company's chairman, nominated Ko Ming Lin to replace him as Chairman because he was busy with other duties. (CPDC is specifically entitled to nominate the JV Company's chairman – a Minority Shareholder Safeguard that Praxair specifically guaranteed CPDC to induce CPDC to invest in the JV Company.)

115. Instead of simply recognizing Lin as the JV Company's legitimate new Chairman, however, Praxair and Roby disingenuously conspired to block CPDC's appointment of Lin as Chairman.

116. In a letter from Roby to Lin, Roby alleged that Sheen had simply vacated his position as chairman, leaving the position empty. Thus, Roby alleged that while Sheen was no longer the JV Company's Chairman, neither was Lin. But as evidenced by the meeting minutes of the JV Company board meeting, Sheen did simply not vacate his position as the JV Company's chairman; Sheen *replaced* himself as chairman with Lin. Lin was CPDC's legitimate chairman and CPDC had every right to nominate him under the clear terms of the JV Agreement and the Minority Shareholder Safeguards.

117. But Roby did not stop there. In the same letter, Roby asserted that if the Chairman was on leave or unable to exercise his duties as Chairman, the Vice Chairman (*i.e.,* Roby herself) would act on the Chairman's behalf. Roby further wrote that she would be exercising all the powers that the Chairman was entitled to thereby elevating and masquerading herself as the JV Company's *de facto* Chairman indefinitely.

118. Further, as has been briefly discussed, Lin requested the JV Company's

corporate seal so that he could carry out his duties as the JV Company's Chairman in a letter to Joyce Chen and Yu-Ling Shieh. Instead of providing Lin with the JV Company's corporate seal, which Lin was entitled to safe keep, upon information and belief, Praxair, Roby, Chen, and Shieh conspired to eviscerate CPDC's ability to nominate the JV Company's Chairman. Two days later, Roby responded to Lin's letter asserting that the JV Company's Chairman position was vacant and that Lin was not the JV Company's Chairman and thus not entitled to request the JV Company's employees (Chen and Shieh) transfer the company's seal to him. Again, Praxair and the Praxair Appointed JV Company Directors/Officers refused to recognize either Sheen or Lin as the JV Company's Chairman in clear violation of the Minority Shareholder Safeguards that Praxair had promised CPDC in order to induce CPDC to invest in the JV Company.

**D. Praxair And the Praxair Appointed JV Company Directors/Officers Unlawfully Obstruct CPDC's Right to Nominate Directors and Supervisors to the JV Company's Board.**

119. Praxair and the Praxair Appointed JV Company Directors/Officers did not stop at refusing to recognize Lin as the JV Company's Chairman; they went on to remove all CPDC's nominees as directors and supervisors of the JV Company. Again, this was an extraordinary act given that CPDC had been a good business partner to Praxair for years but for the fact that Praxair wanted to cover up its misconduct.

120. Subsequently, in a letter from Praxair to the JV Company's board, John Panikar requested that Anne Roby cause the JV Company's board to convene a shareholders' meeting. Absurdly, three days later, *Praxair's own nominees* to the JV Company's board – Anne Roby, William Pearce, Eric Chiao, and Steve Riddick – called a special board meeting and resolved not to hold a shareholders' meeting in denial of *Praxair's own request* to convene a shareholders' meeting, and, Roby, Praxair's own nominee as the JV Company's vice chairman (who had also unilaterally elevated herself as the JV Company's acting

Chairman) wrote a letter to Praxair refusing to call a shareholders' meeting.

121. Using the JV Company's refusal of Praxair's request to convene a shareholders' meeting as a pretext—a refusal manufactured by Praxair itself—Praxair utilized Article 173 of Taiwan's Company Act to petition Taiwan's Ministry of Economic Affairs (the "MOEA") for a special shareholders' meeting. Article 173 of Taiwan's Company Act provides that (a) if a shareholder owning three or more percent of a company's shares proposes a shareholders' meeting, and (b) the company's board of directors does not convene the shareholders' meeting within 15 days following the request, then (c) the shareholder may obtain authority to convene a special shareholders' meeting from the MOEA.

122. The MOEA somehow approved Praxair's petition for a special shareholders meeting. And, at the special shareholders' meeting, Praxair filled all the JV Company's vacancies for directors and supervisors with its own nominees – Thad Evans, Roby, Panikar, James William Shaughnessy, Michael Gregory Shannon, Margaret Leigh Wilson, Joyce Chen, Eric Chiao, and Krispa Ramaswamy – thereby replacing all CPDC's directors and supervisor nominees in an effort to totally obstruct CPDC's ability to participate in the management of the JV Company.

123. CPDC brought a declaratory action in Taiwan against the JV Company to invalidate Praxair's nomination of directors and supervisors to the JV Company. In two separate court rulings, the Taiwan courts ruled that the MOEA's approval of Praxair's petition for the special shareholders' meeting was improper thus retroactively deeming Praxair's appointment of directors and supervisors at the special shareholders' meeting to be void. But nonetheless, Praxair effectively obstructed CPDC's right to appoint functional directors and supervisors to the JV Company for nearly two years. Importantly, Praxair's attempts to remove CPDC's nominees as directors and supervisors of the JV Company was in total conflict of the Minority Shareholder Rights Praxair had promised CPDC in order to induce

32

CPDC to invest in the JV Company.

**E. Praxair Successfully Removes All CPDC's Nominees as Directors and Supervisors to the JV Company.**

124. As discussed above, Praxair engaged in a persistent effort to obstruct CPDC's Minority Shareholder Rights under the JV Agreement, including CPDC's right to nominate functioning directors, officers, and supervisors to the JV Company. As a result, CPDC was unable to appoint directors, officers, and supervisors to the JV Company for an extended period. On November 10, 2016, the MOEA notified the JV Company that (a) the term limits of all the JV Company's directors and supervisors was about to lapse, and (b) the JV Company would be left without any directors or supervisors if the JV Company failed to reelect directors and supervisors by January 9, 2017.

125. In response, CPDC's nominee as the JV Company's Chairman, Ko Ming Lin (whose rights as the JV Company's Chairman Praxair and the Praxair Appointed JV Company Directors/Officers continued to obstruct), duly convened a board meeting and shareholders' meeting in an attempt to elect new directors and supervisors to the JV Company. Praxair boycotted both the board meeting and shareholders' meeting convened by Lin. Under Taiwan law, both board and shareholders' meetings must be attended by at least half of the company's directors or shareholders to be considered valid. Since Praxair owned 51% of PCSM's shares and was entitled to nominate four out of the JV Company's seven directors, CPDC was unable to nominate directors and supervisors to the JV Company at the board and shareholders' meetings convened by Lin and the term limits of the JV Company's directors and supervisors lapsed on January 10, 2017. Again, Praxair and the Praxair Appointed JV Company Directors/Officers had precluded any effective exercise of CPDC's Minority Shareholders Rights.

126. But Praxair did not stop there – again, it went on to pack the JV Company's seven directors and two supervisors with its own nominees. As discussed, under Article 173

of Taiwan's Company Act, if a company is left without any directors, its shareholders may seek leave from the MOEA to convene a special shareholders' meeting and the MOEA approved. Praxair petitioned the MOEA for a special shareholders' meeting to be held on February 21, 2017. But before the shareholders' meeting, Praxair and the Praxair Appointed JV Company Directors/Officers threatened CPDC that if CPDC attended the shareholders' meeting, then Praxair, which owned 51% of the JV Company's shares, would further eviscerate CPDC's Minority Shareholder Rights by amending the JV Company's charter documents so that the JV Company would only have (a) three directors and (b) one supervisor, which would further eviscerated CPDC's Minority Shareholders Rights. Praxair had not complied with the Minority Shareholder Rights under the JV Agreement and reducing the JV Company's directors and supervisors would mean that CPDC would only be able to elect one of the JV Company's three directors and *none* of its supervisors.

127. Fearing further erosion to its Minority Shareholder Rights, CPDC did not attend the February 21, 2017 special shareholders' meeting. And, at the special shareholders' meeting, Praxair again packed all seven directors and supervisors spots on the JV Company with its own nominees, in total violation of CPDC's Minority Shareholder Rights under the JV Agreement. While CPDC is challenging the validity of Praxair's nominees as directors and supervisors of the JV Company, prior to any Taiwan court ruling to the contrary, all the JV Company's directors and supervisors will be Praxair's nominees.

**Praxair has totally eviscerated CPDC's rights to manage and monitor the JV Company.**

128. Indeed, Praxair's level of interference with CPDC's ability to participate in the JV Company's management – notwithstanding multiple court rulings finding such obstruction to be unlawful – is so extreme that CPDC's accounting and finance department and its financial auditor, KPMG, have directed CPDC to discontinue recognizing its investment in the JV Company under the "equity method" of accounting because (notwithstanding its 49%

equity interest) it can no longer exert significant influence over the JV Company as a matter of fact.

**F.  Praxair Attempts to Scuttle the JV Company.**

   **Praxair petitions a Taiwan court to liquidate the JV Company.**

129. Taking the absurd position that CPDC had breached the JV Agreement and failed to cure its purported breach, Praxair proclaimed—without any bilateral discussions with CPDC—that the JV Agreement had been terminated.

130. In line with this, Praxair petitioned a Taiwanese court to dissolve the JV Company, alleging that JV Agreement had been terminated.   The trial court ruled that Praxair's petition was improper and refused to dissolve the JV Company.   Praxair appealed the trial court's decision and continues to take other measures in an attempt to dissolve the JV Company.   As of the filing of this Complaint, *Praxair's number one priority with respect to the JV Company is to attempt to liquidate it*.   The liquidation of the JV Company would facilitate Praxair's cover up of its prior misconduct and the transfer of the JV Company's business to a new subsidiary.

   **Praxair secretly sets up a separate subsidiary in Taiwan in order to transfer the JV Company's business to the subsidiary.**

131. In anticipation of the JV Company's dissolution, Praxair and the Praxair Appointed JV Company Directors/Officers secretly set up a separate Taiwanese subsidiary, Praxair Taiwan, on or about July 29, 2013.   Praxair Taiwan is registered to engage in the very same business activities as the JV Company with the relevant Taiwanese competent authorities.   Praxair and the Praxair Appointed JV Company Directors/Officers plan to transfer the *entirety* of the JV Company's business to Praxair Taiwan upon the JV Company's dissolution (detailed further below).   Thus, Praxair Taiwan is registered to engage in the very same business activities as the JV Company with the relevant Taiwanese competent authorities.

132. Again, this is notwithstanding the fact that in inducing CPDC to invest in the

JV Company, Praxair, as a Minority Shareholder Safeguard, promised CPDC that it would not set up a separate subsidiary in Taiwan to compete with the JV Company absent CPDC's consent. Meanwhile, CPDC had always been faithfully complying with its own noncompetition obligation and has forgone business opportunities while respecting its restrictions under the JV Agreement and relying upon Praxair's good faith performance of the JV Agreement.

**Praxair forces the JV Company to withhold all dividend payments to CPDC in order to stockpile cash at the JV Company and fraudulently transfer cash to Praxair's affiliates.**

133. After CPDC requested reasonable investigations into the Conflicted Silane Transactions, Praxair and the Praxair Appointed JV Company Directors/Officers conspired to force the JV Company to withhold any dividend payments to CPDC—several millions worth of dividends over the applicable period—in order to stockpile cash at the JV Company and then fraudulently transfer the cash to Praxair's affiliates.

134. In line with this, Thad Evans, Anne Roby, John Panikar, William Shaughnessy, Michael Gregory Shannon, Margaret Leigh Wilson, and Joyce Chen (having forcibly removed CPDC's nominees as the JV Company's directors) unlawfully resolved to withhold millions of dollars in dividends from CPDC during two unlawfully convened JV Company board meetings.

135. Again, this is notwithstanding the Minority Shareholder Safeguards Praxair promised CPDC in inducing CPDC to invest in the JV Company. This is also notwithstanding the fact that under Article 66-9 of Taiwan's Income Tax Act, retained earnings not distributed as dividends to shareholders are subject to an additional 10% surtax.

**Praxair and the Praxair Appointed JV Company Directors/Officers transfer the JV Company's resources to Praxair's wholly-owned subsidiary.**

136. After CPDC requested reasonable investigations into the silane transactions, Praxair and the Praxair Appointed JV Company Directors/Officers secretly forced the JV

Company to transfer funds in a series of transactions to Praxair's Irish affiliate (collectively, the "Conflicted Financing Transactions").

137. For example, on July 1, 2014, Praxair and the Praxair Appointed JV Company Directors/Officers —upon information and belief, including Praxair, Joyce Chen, Mei Lu, and others—forced the JV Company to "loan" NT$40,829,396 to Praxair Ireland at the artificially low interest rate of 0.09% per *annum*.   Further, on December 31, 2015, Praxair, Joyce Chen, Mei Lu, and others—forced the JV Company to "loan" NT$1,183,046 to Praxair Ireland for 0.12% per *annum*.   This is notwithstanding the fact that CPDC's cost to finance capital from banks was at least 1.53%-2.345% per *annum* (probably much higher) – at least 12.75 to 26 times greater than the interest rates Praxair forced the JV Company to extend loans to Praxair Ireland at.

138. Because Praxair has refused to provide CPDC with the JV Company's financial statements for years, as discussed above, CPDC was unable to discover the Conflicted Financing Agreements until recently in 2017.   Upon information and belief, Praxair and the Praxair Appointed JV Company Directors/Officers have caused the JV Company to transfer additional amounts to Praxair Ireland and/or other Praxair affiliates (also referred to as the "Conflicted Financing Transactions" herein).

139. Remarkably, Praxair and the Praxair Appointed JV Company Directors/Officers caused the JV Company to engage in the Conflicted Financing Transactions notwithstanding the fact that Praxair has alleged that the JV Company's internal rate of return was 10% per *annum* – 83 to 111 times greater than the interest rates the JV Company extended loans to Praxair Ireland at.   Also remarkable is the fact that Praxair has alleged that during the periods when the Conflicted Financing Transactions occurred (upon information and belief, they continue to occur), the JV Company was going through a "financial crisis" because it was short on liquid cash.

140. Again, all this is in conflict with the Minority Shareholder Safeguards Praxair guaranteed CPDC in inducing CPDC to invest in the JV Company.

## IV. CPDC Requests Compensation from Praxair for Its Damages.

141. CPDC has requested that Praxair compensate CPDC and/or the JV Company for the injuries sustained by CPDC and the JV Company stemming from the actions of Praxair and the Praxair Appointed JV Company Directors/Officers described herein, including those relating to the Conflicted Silane Transactions and the Conflicted Financing Transactions. Praxair has either ignored or refused all such requests.

## V. CPDC Requests Arbitration Against Praxair.

142. Based on much of the above-referenced events, CPDC was left with no alternative but to request arbitration against Praxair in accordance with the JV Agreement's arbitration clause. On January 23, 2017, CPDC filed its request for arbitration against Praxair, pleading breach of contract and other related claims.

143. In the arbitration, Praxair argued that the JV Agreement's arbitration clause is narrowly-tailored to cover only contract-based claims and thus CPDC's non-contract based claims were outside the scope of the arbitral tribunal's jurisdiction and should be resolved through "litigation." Not wanting to engage in a protracted dispute as to the scope of the arbitral tribunal's jurisdiction, CPDC dropped its non-contract based claims in the arbitration. Thus, CPDC brings, and only brings, non-contract based claims against Praxair in this action.

## FACTS COMMON TO THE RICO CLAIMS

### I. The RICO Enterprise.

144. CPDC is a legal person that has standing to bring a federal civil RICO action.

145. Defendants Praxair, Anne Roby, John Panikar, and Thad Evans are collectively referred to herein as the "RICO Defendants."

146. Each RICO Defendant is a separate "person" that is "capable of holding a legal or beneficial interest in property" within the meaning of 18 U.S.C. § 1961(3).

147. The RICO Defendants, along with Joyce Chen, Yu Ling Shieh, Mei Lu, Praxair (China) Investment Co. Ltd. ("Praxair China"), Praxair Korea Company Limited ("Praxair Korea"), Praxair Electronics (Singapore) ("Praxair Singapore"), and Praxair Ireland collectively formed an enterprise (the "RICO Enterprise") engaged in, or the activities of which affect, interstate or foreign commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c). Each member of the RICO Enterprise conducts and participates directly or indirectly in the conduct of the RICO Enterprise's affairs.

148. The RICO Enterprise's purpose was and is to fraudulently: (a) misappropriate the JV Company's business opportunities and assets, to the detriment of the JV Company and CPDC, by entering into the Conflicted Silane Transactions; (b) shift Praxair's liabilities to the JV Company, including by engaging in the Conflicted Unpackaged Silane Transactions; (c) conceal the RICO Enterprise's wrongdoing; (d) transfer or attempt to transfer the JV Company's assets out of the JV Company to Praxair and its affiliates, including by engaging in the Conflicted Financing Transactions; and/or (e) cover up its misconduct by unlawfully preventing CPDC from exercising its legal rights with respect to the JV Company and attempting to liquidate the JV Company (collectively, the "RICO Objectives").

**II. Members Of The RICO Enterprise.**

149. <u>Praxair</u>. Defendant Praxair is the mastermind of the RICO Enterprise's RICO activities. In order to enrich itself and its wholly owned subsidiaries, Praxair conspired and continues to conspire with the other members of the RICO Enterprise to carry out the RICO Objectives. All this was detrimental to CPDC.

150. Joyce Chen. Defendant Joyce Chen is an integral member of the RICO Enterprise. Chen joined the JV Company in 2001 as Vice President. To reward Chen for his role in the RICO Enterprise, Praxair made Chen the JV Company's President in 2005. Chen has been a member of the JV Company's board of directors since 2005.

151. Chen is responsible for managing the JV Company's business operations and its commercial transactions, including the silane transactions, which accounts for almost 60% of the JV Company's business. Chen also authorized and oversees the Conflicted Financing Transactions, authorizing the JV Company's transfer of millions to Praxair Ireland for almost no consideration in return. Additionally, Chen coordinated with Thad Evans and other members of the RICO Enterprise in attempting to procure CPDC's posthumous ratification of the Conflicted Unpackaged Silane Transactions. When CPDC refused, Chen and other members of the RICO Enterprise systematically stripped CPDC of its Minority Shareholder Safeguards.

152. <u>Yu Ling Shieh</u>. Defendant Yu Ling Shieh joined the RICO Enterprise in 2001, joining the JV Company as an assistant to Joyce Chen. To reward Shieh for her participation in the RICO Enterprise, Praxair has promoted Shieh from an assistant at the JV Company to its Business Operations Support Director. In that role, Shieh is responsible for the JV Company's supply chain management and thus plays an integral to coordinating the Conflicted Silane Transactions. According to Shieh herself, she is "familiar with the [JV Company]'s business in purchasing silane overseas [i.e., the Conflicted Silane Transactions]."

153. <u>Mei Lu</u>. Defendant Mei Lu joined the RICO Enterprise in 2010, joining the JV Company as its Finance Manager. To reward Lu for her participation in the RICO Enterprise, Praxair has promoted Lu to become the JV Company's Finance Director. In that role, she is responsible for the financial and accounting affairs of the JV Company and is thus knowledgeable on all the JV Company's financial arrangements. As the JV Company's Finance Director, Lu was integral to the RICO Enterprise's attempt to manufacture CPDC's breach of the JV Agreement in order to use the purported breach as a pretext to strip CPDC of all its Minority Shareholder Rights. To this end, Lu arranged and procured the CTBC Credit Facility. Further, in her role as the JV Company's Finance Director, Lu also coordinated and

helped execute the Conflicted Financing Transactions, transferring millions in funds out of the JV Company to Praxair Ireland for virtually no consideration in exchange.

154. <u>Anne Roby</u>.    Defendant Anne Roby is an integral member of the RICO Enterprise.    During applicable periods, Roby held numerous executive positions at Praxair and its affiliates.    Roby was also one of Praxair's nominees to the JV Company; from 2011 to January 9, 2017, Roby served as a director on the JV Company's board and as the JV Company's Vice Chairman.

155. Roby was instrumental to the RICO Enterprise's plan to eviscerate the Minority Shareholder Rights Praxair had promised CPDC in order to lure CPDC into investing in the JV Company after CPDC began to suspect that Praxair had engaged in misconduct with respect to the Conflicted Unpackaged Silane Transactions.    As detailed in this Complaint, Roby took the lead to manufacture CPDC's purported breach of the JV Agreement.    Roby also took the lead to strip CPDC of its rights to appoint the JV Company's Chairman as well the JV Company's directors and supervisor.

156. Responsible for, among other things, Praxair's Global Supply Systems, Global Operations Excellence, and Global Procurement, Roby oversees and supervises much of the RICO Enterprise's activities with respect to the Conflicted Silane Transactions.

157. In order to reward Roby for her participation in the RICO Enterprise and its activities, Praxair has rewarded Roby with increasingly senior executive positions at Praxair and its affiliates, including Praxair's Vice President of Global Sales, Praxair Electronics' President, Praxair Asia's President, and most recently in 2014, Praxair's Senior Vice President.

158. <u>John Panikar</u>.    As President of Praxair Asia, Defendant Panikar is an important member of the RICO Enterprise and oversees the Conflicted Silane Transactions. Panikar played an integral role in stripping CPDC of its Minority Shareholder Rights after

CPDC began to suspect the RICO Enterprise's wrongdoing with respect to the Conflicted Unpackaged Silane Transactions. As detailed in this Complaint, Panikar and Roby staged Praxair's refusal of its own request to convene a JV Company shareholders' meeting in an attempt to strip CPDC of its right to nominate any directors or supervisors to the JV Company. In order to aid the RICO Enterprise's control of the JV Company and the RICO Enterprise's efforts to conceal its wrongdoing, Panikar currently serves as a director on the JV Company's board.

159. To reward Panikar for his participation in the RICO Enterprise, Praxair has rewarded Panikar with a number of executive positions at Praxair and its affiliates, including Managing Director of Praxair India, Praxair North America Industrial Gases' Vice President of Product Management and Analysis, Praxair's Vice President for the U.S. South Region, and President of Praxair Asia.

160. <u>Thad Evans</u>. Defendant Thad Evans is a key member of the RICO Enterprise. From the very beginning, Evans served as one of the promoters and initial shareholders of the JV Company before Praxair and CPDC formally became the JV Company's actual shareholders. With decades of experience in the silane business and in dealing with silane suppliers, Evans oversees and executes the Conflicted Silane Transactions on a day-to-day basis. For example, Evans assists Praxair in setting the inflated prices at which it sells Unpackaged Silane to the JV Company as part of the Conflicted Unpackaged Silane Transactions. Evans then coordinates with Joyce Chen, Yu Ling Shieh, and Mei Lu to execute the Conflicted Unpackaged Silane Transactions. Evans also helps oversee Praxair's storage of its own products in the United States and then assists Praxair pass on these storage costs to the JV Company for no consideration whatsoever. To this end, Praxair has served as a director on the JV Company's board since 1999 and is Praxair's current nominee as the JV Company's Chairman.

161. To reward Evans for his participation in the RICO Enterprise, Praxair has awarded Evans with increasingly senior executive positions at Praxair and its affiliates, including, Managing Director, General Manager, and Director of Asia Electronic Gases at Praxair, and Vice President of Praxair Asia Electronic Gases.

162. <u>Praxair China, Praxair Korea, and Praxair Singapore</u>.    Praxair China, Praxair Korea, and Praxair Singapore conspired and continue to conspire with the other members of the RICO Enterprise to purchase Packaged Silane from the JV Company at below-market prices even though the JV Company could have sold the very same Packaged Silane to third parties at market prices.    In this way, these members of the RICO Enterprise enriched themselves, at the expense of the JV Company and CPDC, by purchasing Packaged Silane at below market prices, which they then resold to third parties at market prices for a margin. All this was detrimental to CPDC.

163. <u>Praxair Ireland</u>.    Praxair Ireland conspired with the other members of the RICO Enterprise to cause the JV Company to transfer large amounts of funds to Praxair Ireland in the form of dubious, virtually zero-interest rate "loans" (from 0.09% to 0.12% per *annum*).    This was despite the fact that the JV Company had to borrow the very same funds from banks at interest rates of up to 26 times as much as the interest rates Praxair Ireland paid the JV Company to "borrow" the funds.    This was also despite the fact that Praxair said that the JV Company's internal rate of return was 10% and the fact that Praxair said that at the time of these "loans," the JV Company was very short on liquid funds and faced a "financial crisis." Praxair Ireland is a fraudulent transferee of the assets that the RICO Enterprise attempts to transfer from the JV Company to Praxair and its affiliates.    All this was detrimental to CPDC.

164. As described below, the RICO Enterprise engaged in a systematic and persistent pattern of unlawful activities.

165. The RICO Defendants have known each other over years, indeed decades. They interact and bond professionally and socially. The RICO Defendants are business associates, colleagues, friends, and/or acquaintances. The RICO Defendants have a close employer-employee, collegial, and/or social relationship. The RICO Defendants' relationship has a continuous and cohesive structure that is separate from the underlying criminal purpose of the RICO Enterprise.

### III. The Pattern Of Racketeering Activity

166. The racketeering acts set forth herein were carried out over multiple years, were related and similar, and were committed as part of the RICO Defendants' scheme to carry out the RICO Objectives. If not stopped, the RICO Defendants' scheme will continue into the future.

167. As part of the pattern of racketeering activity, and for the purpose of executing the scheme or artifice to defraud as described above, the RICO Defendants engaged in activities in violation of 18 U.S.C. § 1341 (mail fraud) in furtherance of the RICO Objectives.

168. As part of the pattern of racketeering activity, and for the purpose of executing the scheme or artifice to defraud as described above, the RICO Defendants engaged in activities in violation of 18 U.S.C. § 1343 (wire fraud) in furtherance of the RICO Objectives.

169. This pattern of racketeering activity poses a specific threat—indeed the reality—of repetition extending indefinitely into the future. The RICO Enterprise continues to carry out the RICO Objectives.

170. To achieve the RICO Objectives, each of the RICO Defendants engaged in at least two predicate acts enumerated in 18 U.S.C. § 1961(1), in furtherance of the RICO Objectives. For example:

171. Praxair. In furtherance of the RICO Objectives, Praxair willfully committed the predicate act of wire fraud, in violation of 18 U.S.C. § 1343, by wiring money from the

JV Company's bank accounts located in Taiwan to Praxair's bank accounts located in the United States, including, for example, a JP Morgan Chase Bank Account (Acc#134-0-9XXXX; ABA/Routing #021 000 XXX; Swift CHASUS33) located in New York.   In one instance, on or about August 2011, Praxair (from an office located at 175 East Park Drive Tonawanda, New York) purchased $398,925 in Unpackaged Silane from REC (located 119140 Rick Jones Way, Silver Bow, Montana).   Praxair then resold the Unpackaged Silane to the JV Company (located at 6F, 145 Shian Jeng 9th Road, Jubei Hsinchu, Taiwan) and asked REC to ship the Unpackaged Silane from REC's premises (located in Washington State or Montana) directly to the JV Company's facilities (located at No. 217-1, Tzchiang Road, Sec. 2, Toufen Jen, Miaoli 35145, Taiwan).

172. In furtherance of the RICO Objectives, Praxair willfully committed the predicate act of wire fraud, in violation of 18 U.S.C. § 1343, by wiring money on or about September 2011, from its office located at 175 East Park Drive Tonawanda, New York, in the amount of $397,620 for Unpackaged Silane to REC located at 119140 Rick Jones Way, Silver Bow, Montana.   Praxair then resold the same Unpackaged Silane to the JV Company located at 6F, 145 Shian Jeng 9th Road, Jubei Hsinchu, Taiwan and asked REC to ship the Unpackaged Silane from REC's premises (located in Washington State or Montana) directly to the JV Company's facilities located at No. 217-1, Tzchiang Road, Sec. 2, Toufen Jen, Miaoli 35145, Taiwan.

173. These transactions, part of the RICO Enterprise's activities relating to the Conflicted Silane Transactions, were specifically in furtherance of the RICO Enterprise's commission of the RICO Objectives.

174. Anne Roby.   In furtherance of the RICO Objectives, Anne Roby willfully committed the predicate act of mail fraud, in violation of 18 U.S.C. § 1341, when she sent a letter from the United States using the United States Postal Service or a private carrier to

Praxair's Connecticut offices on August 1, 2014, refusing to honor Praxair's request to call a shareholders' meeting. This mail communication was sent in furtherance of the RICO Objectives; specifically, this letter was part of the RICO Enterprise's scheme to eliminate CPDC's nominees as directors and supervisors to the JV Company and pack the JV Company with only Praxair's nominees as directors and supervisors.

175. In furtherance of the RICO Objectives, Anne Roby willfully committed the predicate act of mail fraud, in violation of 18 U.S.C. § 1341, when she sent a letter from the United States using the United States Postal Service or a private carrier to Tony Sheen in Taiwan on February 7, 2013, asserting that Sheen had vacated his position as the JV Company's Chairman without following the proper procedures for selecting a replacement and that she had elevated herself to be the JV Company's *de facto* Chairman. This mail communication was sent in furtherance of the RICO Enterprise's scheme to manufacture CPDC's purported breach of the JV Agreement and eliminate CPDC's nominee as the JV Company's Chairman.

176. In furtherance of the RICO Objectives, Anne Roby willfully committed the predicate act of mail fraud, in violation of 18 U.S.C. § 1341, when she sent a letter from the United States using the United States Postal Service or private carrier to Tony Sheen in Taiwan on February 6, 2013, demanding that CPDC cure its purported breach of the JV Agreement. This letter was sent in furtherance of the RICO Enterprise's scheme to defraud CPDC and the JV Company, and specifically to manufacture a purported breach of the JV Agreement and CPDC's purported failure to cure the breach of the JV Agreement.

177. John Panikar. In furtherance of the RICO Objectives, John Panikar willfully committed the predicate act of mail fraud, in violation of 18 U.S.C. § 1341, when he sent a letter from the United States using the United States Postal Service or private carrier to the board of the JV Company on July 21, 2014, requesting that the JV Company convene a

shareholders' meeting.   This letter was sent in furtherance of the RICO Enterprise's scheme to defraud CPDC and specifically to manufacture a purported breach of the JV Agreement and CPDC's purported failure to cure the breach of the JV Agreement.

178. In furtherance of the RICO Objectives, Panikar, in violation of 18 U.S.C. § 1341, sent a letter, dated February 29, 2016, from the United States using the United States Postal Service or a private carrier to the JV Company's board in Taiwan.   In the letter, Panikar fraudulently denies that Ko Ming Lin was the JV Company's Chairman.   This was notwithstanding the fact that the Taiwan Supreme Court had already ruled that Lin was the JV Company's Chairman.

179. In furtherance of the RICO Objectives, and in violation of 18 U.S.C. § 1341, Panikar sent a letter from the United States using the United States Postal Service or private carrier to the JV Company's board on November 9, 2016, requesting that the JV Company convene a special shareholders' meeting to, without CPDC's consent, (a) amend the JV Company's Articles of Association, and (b) reduce the number of directors and supervisors from seven to three and from two to one respectively, both of which are contrary to the Minority Shareholder Safeguards.

180. In furtherance of the RICO Objectives, and in violation of 18 U.S.C. § 1341, Panikar sent a letter to CPDC, dated April 25, 2014, from the United States using the United States Postal Service or a private carrier, attempting to silence CPDC and preclude any lawsuits against the RICO Enterprise by offering to pay CPDC $18 million to purchase CPDC's equity stake in the JV Company.   This was notwithstanding the fact that CPDC's damages arising from the activities described in this Complaint are probably in the hundreds of millions of dollars and CPDC's equity stake in the JV Company also has substantial value. This letter was in furtherance of the RICO Enterprise's efforts to conceal their wrongdoing by paying CPDC cents on the dollar.   When CPDC refused Praxair's offer, the RICO

Enterprise's efforts to scuttle the JV Company and fraudulently transfer the bulk of the JV Company's assets to Praxair's affiliates went into overdrive.

181. <u>Thad Evans</u>.    In furtherance of the RICO Objectives, Thad Evans willfully committed the predicate act of wire fraud, in violation of 18 U.S.C. § 1343, when he sent an e-mail from a server located in the United States, dated March 28, 2012 to his colleagues at Praxair and a number of Praxair's subsidiaries in Asia to coordinate the Conflicted Unpackaged Silane Transactions.

182. In furtherance of the RICO Objectives, Thad Evans willfully committed the predicate act of wire fraud, in violation of 18 U.S.C. § 1343, when he sent an e-mail from a server located in the United States, dated August 2, 2012 to Joyce Chen directing Chen to demand that CPDC retroactively agree to the Purported Praxair-JV Company Supply Agreement, the Conflicted Silane Transactions, and any attendant losses to the JV Company.

183. The RICO Defendants engaged in further acts of mail and wire fraud by causing the transfers of funds from the JV Company to Praxair and other Praxair-related companies.

184. The RICO Enterprise has participated in a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5) because it has participated in the specific racketeering activities set forth above and numerous other acts of racketeering activities. Thus, there have been at least two acts of racketeering activity, the last of which occurring within ten years after the commission of a prior act of racketeering activity.    The racketeering activities continue to persist.

185. The RICO Enterprise's acts of racketeering are also related and continuous.

186. The acts of racketeering are related in that they have: the same or similar purpose of furthering the RICO Objectives; the same participants, the RICO Enterprise, including the RICO Defendants; the same victim, CPDC; similar methods of commission,

sending documents, letters, and other items by mail and wire in furtherance of the RICO Objectives; and are otherwise interrelated by distinguishing characteristics and are not isolated events.

187. The acts are continuous in that they represent both (a) a close-ended scheme consisting of a series of related racketeering activity extending over a substantial period of time, and (b) an open-ended scheme with the threat of continuity. The RICO Defendants began to engage in racketeering acts from no later than 2008 (but probably much earlier) and continue to engage in racketeering activities. Further, there is a threat (indeed the reality) of continuity – there is no indication that the acts of racketeering have or will subside.

## IV. The RICO Enterprise Affects Interstate or Foreign Commerce

188. Both the RICO Enterprise itself and the RICO Enterprise's racketeering activities affected and continue to affect interstate commerce.

189. The RICO Enterprise itself is in the business of carrying out the RICO Objections, including fraudulently depriving and dissipating CPDC of its assets through activities that have a foreign and interstate nexus.

190. The RICO Defendants and the RICO Enterprise engaged in and affected interstate or foreign commerce. For example:

191. The Conflicted Unpackaged Silane Transactions. The RICO Enterprise sold or caused Praxair (located in Connecticut) to sell Unpackaged Silane to the JV Company (located in Taiwan). Praxair first purchased much of the Unpackaged Silane from REC (located in Washington and Montana). Praxair then resold the Unpackaged Silane to the JV Company and requested REC to ship the Unpackaged Silane to the JV Company's facilities in Taiwan. The RICO Defendants next caused the JV Company to pay Praxair, wiring money from the JV Company's bank accounts located in Taiwan to Praxair's bank accounts located in the United States, including, for example, a JP Morgan Chase Bank Account (Acc#134-0-9XXXX; ABA/Routing #021 000 XXX; Swift CHASUS33) located in New

49

York.   For instance:

- In one transaction in or about August 2011, Praxair (from an office located at 175 East Park Drive Tonawanda, New York) purchased $398,925 in Unpackaged Silane from REC (located 119140 Rick Jones Way, Silver Bow, Montana).   Praxair then resold the Unpackaged Silane to the JV Company (located at 6F, 145 Shian Jeng 9th Road, Jubei Hsinchu, Taiwan) and asked REC to ship the Unpackaged Silane from REC's premises (located in Washington State or Montana) directly to the JV Company's facilities (located at No. 217-1, Tzchiang Road, Sec. 2, Toufen Jen, Miaoli 35145, Taiwan).

- In another transaction in or about September 2011, Praxair (from an office located at 175 East Park Drive Tonawanda, New York) purchased $397,620 in Unpackaged Silane from REC's (located 119140 Rick Jones Way, Silver Bow, Montana).   Praxair then resold the Unpackaged Silane to the JV Company (located at 6F, 145 Shian Jeng 9th Road, Jubei Hsinchu, Taiwan) and asked REC to ship the Unpackaged Silane from REC's premises (located in Washington State or Montana) directly to the JV Company's facilities (located at No. 217-1, Tzchiang Road, Sec. 2, Toufen Jen, Miaoli 35145, Taiwan).

192. The Conflicted Packaged Silane Transactions.   The RICO Enterprise directed Praxair (located in Connecticut) to cause the JV Company (located in Taiwan) to sell Packaged Silane to both (a) Praxair itself, and (b) Praxair's wholly-owned subsidiaries located in Mainland China, Singapore, and South Korea.

193. The Conflicted Financing Transactions.   The RICO Enterprise, for example, directed Praxair (located in the United States), on or about July 1, 2014, to cause the JV Company (located in Taiwan) to extend loans to Praxair Ireland (located in Ireland) at close to zero percent per *annum*.

194. Interstate and Foreign Use of the Wire.   Thad Evans, for example, sent an e-mail to Joyce Chen, dated August 2, 2012, from an e-mail server located in the United States belonging to Praxair (located in the United States) to an e-mail server located in Taiwan belonging to the JV Company (located in Taiwan).   In the e-mail, Evans told Joyce Chen to

demand CPDC to retroactively recognize any losses (projected or realized) to the JV Company arising from the Purported Praxair-JV Company Supply Agreement.

195. <u>Interstate and Foreign Use of the Mail</u>.   John Panikar sent a letter from the United States to the JV Company's board (located in Taiwan) requesting the JV Company to convene a shareholders' meeting.   Roby, Praxair's own nominee to the JV Company's board, sent a letter, dated August 1, 2014, on behalf of the JV Company's board (located in Taiwan) to Praxair (located in the United States) refusing to call the shareholders' meeting.

**V.    CPDC Suffered, and Continues to Suffer, Injury, Including Domestic United States Injury, as a Result of the RICO Enterprise's Conduct.**

196. The RICO Defendants' violation of 18 U.S.C. § 1862 both legally and proximately caused CPDC to suffer injury to its business and property.   For example, the RICO Defendants, through the RICO Enterprise, among other things:

(a) Forced the JV Company to purchase Unpackaged Silane at above-market prices from Praxair under the Purported Praxair-JV Company Supply Agreement, transferring funds that otherwise would have been distributed to CPDC as profit to Praxair in the United States.   Thus, CPDC was deprived of, and Praxair inequitably and unlawfully obtained from CPDC, value in the amount of CPDC's proportionate equity interest in the JV Company multiplied by the difference between the actual prices the JV Company paid for the Unpackaged Silane minus the much lower market prices of Unpackaged Silane.

(b) Forced the JV Company to sell Packaged Silane to Praxair's wholly-owned subsidiaries in other jurisdictions at depressed prices when the JV Company could have sold the Packaged Silane to third parties at much higher, market prices so that profits that otherwise would have been distributed to CPDC were diverted to Praxair in the United States.   Thus, CPDC was deprived of, and Praxair inequitably and unlawfully obtained from CPDC, value in the amount

of CPDC's proportionate equity interest in the JV Company multiplied by the difference between the market price of the Packaged Silane the JV Company sold to Praxair and Praxair's wholly-owned subsidiaries minus the much lower actual transaction prices.

(c) Siphoned funds out of the JV Company to Praxair Ireland through the Conflicted Financing Transactions by forcing the JV Company to extend virtually interest-free loans to Praxair Ireland. Thus, CPDC was deprived of, and Praxair inequitably and unlawfully obtained from CPDC, value in the amount of CPDC's proportionate equity interest in the JV Company multiplied by the discrepancy between market interest rates and the much lower interest rates Praxair Ireland paid to the JV Company on the principal amount of funds transferred from the JV Company to Praxair Ireland.

(d) Forced the JV Company to pay for Praxair's storage and other ancillary costs relating to Praxair's own Unpackaged Silane for no consideration whatsoever. Thus, CPDC was deprived of, and Praxair inequitably and unlawfully obtained from CPDC, value in the amount of CPDC's proportionate equity interest in the JV Company multiplied by the amount of storage and other ancillary costs Praxair shifted to the JV Company for no consideration.

197. The amounts Praxair inequitably and unlawfully obtained from CPDC described in paragraphs 196(a)-(c) herein are referred to as the "Constructive Trust Res."

198. Thus, Praxair holds and for many years has held, in the United States, as constructive trustee, the Constructive Trust Res, on behalf of CPDC, the constructive trust beneficiary. As described herein, Praxair refuses to return the Constructive Trust Res to CPDC notwithstanding CPDC's requests for Praxair to do so. Thus, CPDC suffered and continues to suffer injury to its property located in the United States.

199. CPDC also suffered domestic United States injuries as the direct and proximate result of the RICO Defendants' conduct, through the RICO Enterprise, in that:

200. CPDC is a publicly traded company that has numerous individual and institutional shareholders located in the United States. By injuring CPDC and depriving CPDC of millions in profits that were diverted from the JV Company to Praxair in the United States, the RICO Defendants caused CPDC to become materially less attractive to potential and actual investors in the United States.

201. CPDC also has a substantial nexus to the United States. For example, CPDC has major customers in the United States, has business partners in the United States, and owns property in the United States. Thus, CPDC's operations, relationships, and property extend to the United States. Thus, by injuring CPDC, the RICO Defendants, through the RICO Enterprise, have caused CPDC to suffer injuries that extend to the United States.

202. Further, the RICO Defendants' conduct was and is based out of the United States and a major part of the RICO Defendants' conduct took place in the United States.

203. But for the RICO Defendants' operation of the RICO Enterprise, CPDC and the JV Company would not have been injured.

204. As discussed above, because of the RICO Enterprise's efforts to conceal information and documents, CPDC did not learn of many of the above facts until recently.

## FACTS COMMON TO THE DERIVATIVE ACTION

205. As a result of the events described in this Complaint, CPDC, as a major shareholder of the JV Company, requested the JV Company's current registered supervisors (both of whom were nominated by Praxair even though CPDC is supposed to be able to nominate one of the supervisors under the terms of the JV Agreement and the Minority Shareholder Safeguards), to bring suit against the JV Company's current and past directors.

206. Under Article 214 of Taiwan's Company Act, a shareholder of a company

must first demand that a company's supervisors bring suit against one or more putative defendants before the shareholder may bring suit against the defendants derivatively on behalf of the company. If the supervisors fail to bring suit within 30 days, the shareholder may bring suit derivatively.[1]

207. CPDC sent the JV Company's current registered supervisors a demand letter to bring suit against Praxair's current and past nominees (during relevant periods) as the JV Company's directors on August 1, 2017. The JV Company's current supervisors have disregarded CPDC's demand and have not brought suit against any such directors. As of the date of this Complaint, more than 30 days have elapsed since CPDC made its demand.

## EQUITABLE TOLLING

208. Notwithstanding its diligent efforts and due to the intentional concealment by many of the Defendants, CPDC was only able to discover the facts necessary to plead the claims contained in this Complaint in 2017. CPDC expects additional facts to be learned during the course of discovery.

## CAUSES OF ACTION

A. **Count I: Derivative claim for breach of fiduciary duty under Taiwan law relating to the Conflicted Silane Transactions and the Conflicted Financing Transactions, by (1) CPDC derivatively on behalf of the JV Company, against (2) Defendants Joyce Chen, Anne Roby, John Panikar, Thad Evans, William Pearce, Steve Riddick, James William Shaughnessy, Tom Schulte, and Mark Joseph Murphy.**

209. The allegations contained in paragraphs 1 through 208 are incorporated herein

---

[1] Article 214 of Taiwan's Company Act provides:

Shareholder(s) who has/have been continuously holding 3% or more of the total number of the outstanding shares of the company over one year may request in writing the supervisors of the company to institute, for the company, an action against a director of the company.

In case the supervisors fail to institute an action within 30 days after receiving the request made under the preceding Paragraph, then the shareholders filing such request under the preceding Paragraph may institute the action for the company…

by reference.

210. Defendants Joyce Chen, Anne Roby, John Panikar, Thad Evans, William Pearce, Steve Riddick, James William Shaughnessy, Tom Schulte, and Mark Joseph Murphy (collectively, the "Count I Defendants") were or are, during all relevant periods, directors of the JV Company. Under Article 23 of Taiwan's Company Act[2], each of the Count I Defendants owed the JV Company the fiduciary duties of loyalty and care (a duty of "loyalty" and the duty of "due care of a good administrator").

211. By engaging in and/or permitting the Conflicted Silane Transactions and the Conflicted Financing Transactions, each of the Count I Defendants breached their fiduciary duties to the JV Company.

212. Instead of purchasing Unpackaged Silane from or through Praxair, the JV Company could have purchased Unpackaged Silane directly from suppliers of silane, including, but not limited to, REC, at market prices, which were much lower than the prices set by Praxair. This substantially increased the JV Company's cost of goods sold for the sale of Packaged Silane and thus dissipated the JV Company's profit margins and profits on the

---

[2] Article 23 of Taiwan's Company Act provides:

> The responsible person of a company shall have the loyalty and shall exercise the due care of a good administrator in conducting the business operation of the company; and if he/she has acted contrary to this provision, shall be liable for the damages to be sustained by the company therefrom…

Article 8 of Taiwan's Company Act provides:

> The term "responsible persons" of a company as used in this Act denotes shareholders conducting the business or representing the company in case of an unlimited company or unlimited company with limited liability shareholders; directors of a company in case of a limited company or a company limited by shares.

> The managerial officer or liquidator of a company, the promoter, supervisor, inspector, reorganizer or reorganization supervisor of a company limited by shares acting within the scope of their duties, are also responsible persons of a company.

Note, the JV Company is a company limited by shares.

sale of Packaged Silane.

213. In addition, instead of selling Packaged Silane at market prices, the Count I Defendants forced the JV Company to sell Packaged Silane to both (a) Praxair's wholly-owned subsidiaries in various jurisdictions, and (b) even Praxair itself, at prices that were substantially below market prices. This substantially diminished the JV Company's profit margins and profits on the sale of Packaged Silane.

214. Further, the Count I Defendants forced the JV Company to loan funds to Praxair Ireland at substantially below-market interest rates ranging from 0.09% to 0.12% per *annum*. This is notwithstanding the fact that: (a) the JV Company borrowed funds from creditors at much higher market interest rates; (b) Praxair alleges that the JV Company's internal rate of return is 10% per *annum*; and (c) the Conflicted Financing Transactions occurred at a time during which Praxair alleges that the JV Company faced a "financial crisis" and was short on liquid funds for its operations.

215. As a direct and proximate result of the Count I Defendants' breach of their fiduciary duties to the JV Company with respect to the Conflicted Silane Transactions and the Conflicted Financing Transactions, the JV Company suffered damages.

WHEREFORE, CPDC, derivatively on behalf of the JV Company, requests this Court enter judgment against the Count I Defendants for general, compensatory, exemplary, statutory and/or such other damages as may be deemed just and proper, in an amount to be determined at trial.

**B. Count II: Conversion by CPDC against Praxair.**

216. The allegations contained in paragraphs 1 to 215 are incorporated herein by reference.

217. By engaging in the activities described in this Complaint—including, but not limited to, the Conflicted Silane Transactions, the Conflicted Financing Transactions, and the removal of CPDC's directors and officer nominees to the JV Company (collectively, the

"Prohibited Conversion Activities")—Praxair assumed and exercised ownership over substantial funds rightfully belonging to the JV Company and thereby assumed and exercised ownership over a substantial portion of the value of CPDC's equity interest in the JV Company (that portion of the value of CPDC's equity interest in the JV Company being referred to as the "Converted Equity Value").

218. CPDC's proper authorization to engage in the Prohibited Conversion Activities was not obtained.

219. By engaging in the Prohibited Conversion Activities, Praxair received economic benefit, in the amount of the Converted Equity Value, to CPDC's detriment.

220. As a direct and proximate result of Praxair's actions, CPDC was permanently and indefinitely excluded and deprived from its right to the Converted Equity Value.

221. CPDC suffered actual damages as a direct and proximate result of Praxair's actions.

222. Praxair's conduct, as alleged herein, is aggravated by certain willful wantonness and/or malice, for which the law allows the imposition of, among other things, exemplary or punitive damages.

WHEREFORE, CPDC requests this Court enter judgment against Praxair for general, compensatory, exemplary damages, and/or such other damages as may be deemed just and proper, in an amount to be determined at trial.

**C. Count III: Civil Conspiracy to commit conversion by CPDC against Praxair, Anne Roby, John Panikar, Thad Evans, Joyce Chen, Yu Ling Shieh, Mei Lu, and Various Doe Defendants.**

223. The allegations contained in paragraphs 1 through 222 are incorporated herein by reference.

224. Defendants Anne Roby, John Panikar, Thad Evans, Joyce Chen, Yu Ling Shieh, Mei Lu, and Various Doe Defendants (collectively the "Count III Defendants"),

combined together, with Praxair and others, entering into an agreement for the common purpose of converting the Converted Equity Value.

225. CPDC suffered actual damages as a direct and proximate result of the Count IV Defendants' actions.

226. The Count III Defendants' conduct, as alleged herein, is aggravated by that certain willful wantonness and/or malice, for which the law allows the imposition of, among other things, exemplary or punitive damages.

WHEREFORE, CPDC requests this Court enter judgment against the Count III Defendants for general, compensatory, exemplary damages, and/or such other damages as may be deemed just and proper, in an amount to be determined at trial.

**D. Count IV: Civil aiding and abetting conversion by CPDC against Anne Roby, John Panikar, Thad Evans, Joyce Chen, Yu Ling Shieh, Mei Lu, and Various Doe Defendants.**

227. The allegations contained in paragraphs 1 through 226 are incorporated herein by reference.

228. Defendants Anne Roby, John Panikar, Thad Evans, Joyce Chen, Yu Ling Shieh, Mei Lu, and Various Doe Defendants (collectively, the "Count IV Defendants") were each generally aware of their roles in carrying out the Prohibited Conversion Activities.

229. The Count IV Defendants knowingly and substantially assisted Praxair in carrying out the Prohibited Conversion Activities.

230. CPDC suffered damages as a direct and proximate result of the Count IV Defendants' actions.

231. The Count IV Defendants' conduct, as alleged herein, is aggravated by that certain willful wantonness and/or malice, for which the law allows the imposition of, among other things, exemplary or punitive damages.

WHEREFORE, CPDC requests this Court enter judgment against the Count IV

Defendants for general, compensatory, exemplary damages, and/or such other damages as may be deemed just and proper, in an amount to be determined at trial.

**E. Count V: Federal Civil RICO, 18 U.S.C. § 1962(c) Claim by CPDC against Praxair, Anne Roby, John Panikar, Thad Evans, and various Doe Defendants.**

232. The allegations contained in paragraphs 1 through 231 are incorporated herein by reference.

233. The RICO Enterprise is an enterprise engaged in and whose activities affect interstate commerce.    The RICO Defendants are employed by or associated with the RICO Enterprise.

234. As detailed throughout this Complaint, the RICO Defendants agreed to and did conduct and participate in the conduct of the RICO Enterprise's affairs through a pattern of racketeering activity and for the unlawful purposes of carrying out the RICO Objectives through various activities.

235. Pursuant to and in furtherance of their fraudulent scheme, the RICO Defendants committed multiple related acts in violation of 18 U.S.C. § 1341 (mail fraud) and 18 U.S.C. § 1343 (wire fraud).

236. The acts described and set forth throughout this Complaint constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

237. The RICO Defendants directly and indirectly conducted and participated in the conduct of the RICO Enterprise's affairs through the pattern of racketeering activities described herein, in violation of 18 U.S.C. § 1962(c).

238. As a direct and proximate result of the RICO Defendants' racketeering activities and violations of 18 U.S.C. § 1962(c), CPDC has been injured in its business and property.

WHEREFORE, CPDC requests that this Court enter judgment against the RICO Defendants for treble damages based on the amount of actual damages CPDC sustained and

the costs of the suit, including reasonable attorneys' fees, in accordance with 18 U.S.C. § 1964(c).

**F. Count VI: Federal Civil RICO Conspiracy, 18 U.S.C. § 1962(d) Claim by CPDC against Praxair, Anne Roby, John Panikar, Thad Evans, and various Doe Defendants.**

239. The allegations contained in paragraphs 1 through 238 are incorporated herein by reference.

240. As detailed throughout this Complaint, the RICO Defendants agreed and conspired to violate 18 U.S.C. § 1962(c).

241. These agreements and plans amongst the RICO Defendants persisted throughout the existence of the RICO Enterprise and continue as of the filing of this Complaint.

242. The RICO Defendants have intentionally conspired and agreed to directly and indirectly conduct or participate in the conduct of the affairs of the RICO Enterprise through a pattern of racketeering activity as described herein.

243. Defendants knew that their predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the schemes described above. That conduct constitutes a conspiracy in violation of 18 U.S.C. § 1962(c) and thus in violation of 18 U.S.C. § 1962(d).

244. As a direct and proximate result of the RICO Defendants' conspiracy, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962(d), CPDC has been injured in its business and property.

WHEREFORE, CPDC requests that this Court enter judgment against the RICO Defendants for treble damages based on the amount of actual damages CPDC sustained and the costs of the suit, including reasonable attorneys' fees, in accordance with 18 U.S.C. § 1964(c).

### G. Count VII: Fraudulent Concealment by CPDC against Defendants Praxair, Anne Roby, John Panikar, Thad Evans, Joyce Chen, Yu Ling Shieh, and Mei Lu.

245. The allegations contained in paragraphs 1 through 244 are incorporated herein by reference.

246. As described throughout this Complaint, Praxair and the Praxair Appointed JV Company Directors/Officers engaged in the Conflicted Silane Transactions and the Conflicted Financing Transactions. These Defendants' actions relating to the Conflicted Silane Transactions and Financing Transactions were actionable by CPDC.

247. Defendants Praxair, Anne Roby, John Panikar, Thad Evans, Joyce Chen, Yu Ling Shieh, and Mei Lu (collectively, the "Count VII Defendants") had actual awareness of the facts relating to the Conflicted Silane Transactions and the Conflicted Financing Transactions, as described in this Complaint, necessary to establish CPDC's causes of action against Praxair and other Defendants (collectively, the "Concealed Facts").

248. As described throughout this Complaint, the Count VII Defendants intentionally and affirmatively concealed the Concealed Facts from CPDC.

249. As described throughout this Complaint, the Count VII Defendants intentionally and affirmatively concealed the Concealed Facts from CPDC in order to avoid criminal and financial liability, for the purpose of precluding and/or delaying CPDC from pursuing the claims contained in this Complaint. For example, as described throughout this Complaint, the Count VII Defendants carried out affirmative acts to impede CPDC's nominee as the JV Company's supervisor from conducting meaningful investigations into the JV Company. Further, the Count VII Defendants also engaged in affirmative acts to remove CPDC's nominees as directors, officers, and supervisors in order to further eviscerate CPDC's ability to ascertain information relating to the Conflicted Silane Transactions and the Conflicted Financing Transactions.

250. The Count VII Defendants' conduct, as alleged herein, is aggravated by that certain willful wantonness and/or malice, for which the law allows the imposition of, among other things, exemplary or punitive damages.

WHEREFORE, CPDC requests this Court enter judgment against the Count VII Defendants for general, compensatory, exemplary damages, and/or such other damages as may be deemed just and proper, in an amount to be determined at trial.

### H. Count VIII: Civil Conspiracy to Commit Fraudulent Concealment by CPDC against Praxair, Anne Roby, John Panikar, Thad Evans, Joyce Chen, Yu Ling Shieh, Mei Lu, and various Doe Defendants.

251. The allegations contained in paragraphs 1 through 250 are incorporated herein by reference.

252. Defendants Praxair, Anne Roby, John Panikar, Thad Evans, Joyce Chen, Yu Ling Shieh, and Mei Lu (collectively, the Count VIII Defendants") combined together and entered into an agreement for the common purpose of fraudulently concealing the Concealed Facts from CPDC.

253. CPDC suffered actual damages as a direct and proximate result of the Count VIII Defendants' actions.

254. The Count VIII Defendants' conduct, as alleged herein, is aggravated by that certain willful wantonness and/or malice, for which the law allows the imposition of, among other things, exemplary or punitive damages.

WHEREFORE, CPDC requests this Court enter judgment against the Count V Defendants for general, compensatory, exemplary, statutory, and/or such other damages as may be deemed just and proper, in an amount to be determined at trial.

### I. Count IX: Civil Aiding and Abetting Fraudulent Concealment by CPDC against Praxair, Anne Roby, John Panikar, Thad Evans, Joyce Chen, Yu Ling Shieh, Mei Lu, and various Doe Defendants.

255. The allegations contained in paragraphs 1 through 254 are incorporated herein

by reference.

256. Defendants Praxair, Anne Roby, John Panikar, Thad Evans, Joyce Chen, Yu Ling Shieh, and Mei Lu (collectively, the "Count IX Defendants") were each generally aware of their roles in fraudulently concealing the Concealed Facts from CPDC.

257. The Count IX Defendants knowingly and substantially assisted each other in fraudulently concealing the Concealed Facts from CPDC.

258. CPDC suffered damages as a direct and proximate result of the Count IX Defendants' actions.

259. The Count IX Defendants' conduct, as alleged herein, is aggravated by that certain willful wantonness and/or malice, for which the law allows the imposition of, among other things, exemplary or punitive damages.

WHEREFORE, CPDC requests this Court enter judgment against the Count IX Defendants for general, compensatory, exemplary, statutory, and/or such other damages as may be deemed just and proper, in an amount to be determined at trial.

**J. Count X: Claims under Article 369-4 of Taiwan's Company Act relating to the Conflicted Silane Transactions and the Conflicted Financing Transactions by CPDC against Praxair and Steve Angel.**

260. The allegations contained in paragraphs 1 through 259 are incorporated herein by reference.

261. Article 369-4 of Taiwan's Company Act provides:

> In case a controlling company has caused a subsidiary company to conduct any business which is contrary to normal business practice or not profitable, but fails to pay an appropriate compensation upon the end of the fiscal year involved, and thus causing the subsidiary company to suffer damages, the controlling company shall be liable for damages.

> If the responsible person of the controlling company has caused the subsidiary company to conduct the business described in the preceding Paragraph, he/she shall be liable, jointly and severally, with the controlling company for such damages.

In the event the controlling company fails to make indemnification as required in the Preceding Paragraph, the subsidiary company's creditor, or the shareholder(s) who hold(s) one percent (1%) or more of the outstanding voting shares or of the total amount of the capital stock of the subsidiary company may exercise, in its (or his/their) own name, the rights of the subsidiary company as set forth in the preceding two Paragraphs to claim for the payment of the indemnity from the controlling company to the subsidiary company.

The right to exercise the claim under the preceding Paragraph shall not be prejudiced by a settlement entered into or a waiver made by the subsidiary company, if any, in respect of such right to claim for damages.

262. By engaging in the Conflicted Silane Transactions and the Conflicted Financing Transactions, Praxair, which at all relevant times was and is the "controlling company," caused its subsidiary, the JV Company, to conduct "business which is contrary to normal business practice or not profitable."

263. Praxair has never compensated the JV Company for the injuries suffered by the JV Company as a result of the Conflicted Silane Transactions and the Conflicted Financing Transactions.

264. CPDC is the owner of at least one percent of the JV Company's outstanding shares.

265. CPDC hereby exercises in its own capacity, the rights of the JV Company to be indemnified for the damages caused to the JV Company by Praxair as a result of the Conflicted Silane Transactions and the Conflicted Financing Transactions.

266. Steve Angel was at all relevant times a "responsible person" of Praxair, the controlling company. As a responsible person and director of the controlling company, Angel had an affirmative duty to prevent Praxair from causing the JV Company to engage in the Conflicted Silane Transactions and the Conflicted Financing Transactions. Instead, Angel totally absconded these duties and at the very least permitted Praxair to cause the JV

64

Company to cause the JV Company to engage in the Conflicted Silane Transactions.

267. Thus, Angel caused the JV Company to conduct business contrary to normal business practice or not profitable and is jointly and severally liable with Praxair for the JV Company's damages.

WHEREFORE, CPDC requests this Court enter judgment against Praxair and Steve Angel for general, compensatory, exemplary, statutory, and/or such other damages as may be deemed just and proper, in an amount to be determined at trial.

### K. Count XI: Claims under Articles 184 and 185 of Taiwan's Civil Code by CPDC against all Defendants.

268. The allegations contained in paragraphs 1 through 267 are incorporated herein by reference.

269. Article 184 of Taiwan's Civil Code provides:

A person who, intentionally or negligently, has wrongfully damaged the rights of another is bound to compensate him for any injury arising therefrom. The same rule shall be applied when the injury is done intentionally in a manner against the rules of morals.

A person, who violates a statutory provision enacted for the protection of others and therefore prejudice to others, is bound to compensate for the injury, except no negligence in his act can be proved.

270. Article 185 of Taiwan's Civil Code provides:

If several persons have wrongfully damaged the rights of another jointly, they are jointly liable for the injury arising therefrom. The same rule shall be applied even if which one has actually caused the injury cannot be sure. Instigators and accomplices are deemed to be joint tortfeasors.

271. By engaging in all the activities described in this Complaint, the Defendants have (a) either intentionally or negligently wrongfully damaged CPDC's rights; (b) intentionally caused injury to CPDC in a manner against the rules of morals; and (c) injured CPDC by violating statutory provisions enacted for the protection of others.

272. Thus, the Defendants are "bound to compensate" CPDC for any injuries

arising from the activities described in this Complaint.

273. Further, since Defendants engaged and continue to engage in the activities described in this Complaint in concert with each other, they are jointly liable for CPDC's injuries arising from their actions.

WHEREFORE, CPDC requests this Court enter judgment against the Defendants for general, compensatory, exemplary, statutory, and/or such other damages as may be deemed just and proper, in an amount to be determined at trial.

## DEMAND FOR JURY TRIAL

CPDC on behalf of itself and, derivatively, on behalf of the JV Company, hereby demands a jury trial as provided by Federal Rule of Civil Procedure 38.

Dated: December 4, 2017        ALSTON & BIRD LLP


*/s/ Alexander S. Lorenzo*
Alexander S. Lorenzo
Karl Geercken (*pro hac vice* application forthcoming)
ALSTON & BIRD LLP
90 Park Avenue
New York, NY 10016
Tel: (212) 210-9400
*alexander.lorenzo@alston.com*
*karl.geercken@alston.com*

*Of Counsel:*

LCS & PARTNERS


*/s/ Victor Chang*
Victor Chang (*pro hac vice* application forthcoming)
Christopher Chen (*pro hac vice* application forthcoming)

LCS & PARTNERS

5F, No. 8, Sinyi Road

Taipei City 110

Taiwan

Tel: +886-2-2729-9000

*victorchang@lcs.com.tw*

*chrischen@lcs.com.tw*

*Attorneys for Plaintiff China Petrochemical Development Corporation*